

20 CV 141-SDD-SDJ

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF LOUISIANA**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

THE UNITED STATES OF AMERICA :
*ex rel.* ALICIA C. TAYLOR, MD :
                :
      and :
                :
STATE OF LOUISIANA :
*ex rel.* ALICIA C. TAYLOR, MD :
                :
                :
            **Plaintiffs,** :
                :
           v. :
                :
BATON ROUGE GENERAL MEDICAL CENTER: :
8585 Picardy Avenue :
Baton Rouge, LA 70809 :
                :
SERVE ON REGISTERED AGENT: :
Kendall Johnson or Corey Doughty :
8490 Picardy Avenue :
Baton Rouge, LA 70809 :
                :
      and :
                :
OCHSNER HEALTH SYSTEM :
c/o OCHSNER CLINIC FOUNDATION :
1514 Jefferson Highway :
New Orleans, LA 70121 :
                :
SERVE ON REGISTERED AGENT: :
CT Corporation System :
3867 Plaza Tower Drive :
Baton Rouge, LA 70816 :
                :
      and :
                :
WOMAN'S HOSPITAL :
c/o WOMAN'S HOSPITAL FOUNDATION :
100 Woman's Way :
Baton Rouge, LA 70817 :
                :
                :

**ORIGINAL**
**COMPLAINT UNDER**
**FEDERAL FALSE CLAIMS ACT**
**AND STARK LAW**

**FILED *IN CAMERA* AND**
**UNDER SEAL PURSUANT**
**TO 31 U.S.C. § 3730(b)(2)**

**DO NOT ENTER IN**
**PACER**

**DO NOT PUT IN PRESS BOX**

Receipt # 4699030157

|  | : |  |
| --- | --- | --- |
| SERVE ON REGISTERED AGENT:<br>Stephanie H. Anderson or Donna D. Fraiche<br>100 Woman's Way<br>Baton Rouge, LA 70817 | :<br>:<br>: | **ORIGINAL<br>COMPLAINT UNDER<br>FEDERAL FALSE CLAIMS ACT<br>AND STARK LAW** |
| 450 Laurel Street, 20th Floor<br>Baton Rouge, LA 70809 | :<br>:<br>: | **FILED *IN CAMERA* AND<br>UNDER SEAL PURSUANT<br>TO 31 U.S.C. § 3730(b)(2)** |
| and | : |  |
| DR. VENKAT BANDA<br>2645 Bocage Lake Drive<br>Baton Rouge, LA 70809 | :<br>:<br>: | **DO NOT ENTER IN<br>PACER** |
| SERVE ON REGISTERED AGENT:<br>c/o HMG PHYSICIANS, LLC<br>Carolyn Braud<br>8585 Picardy Avenue<br>Medical Tower 2, Suite 414<br>Baton Rouge, LA 70809 | :<br>:<br>:<br>:<br>:<br>: | **DO NOT PUT IN PRESS BOX** |
| and | :<br>: |  |
| HMG PHYSICIANS, LLC<br>8585 Picardy Avenue<br>Medical Tower 2, Suite 414<br>Baton Rouge, LA 70809 | :<br>:<br>: |  |
| SERVE ON REGISTERED AGENT:<br>Carolyn Braud<br>8585 Picardy Avenue<br>Medical Tower 2, Suite 414<br>Baton Rouge, LA 70809 | :<br>:<br>:<br>:<br>: |  |
| and | :<br>: |  |
| DR. RICHARD RATHBONE<br>11323 Church Street<br>Clinton, LA 70722 | :<br>:<br>: |  |
| SERVE ON REGISTERED AGENT:<br>c/o Richard Rathbone (A Medical Corporation)<br>11323 Church Street<br>Clinton, LA 70722 | :<br>:<br>:<br>: |  |
| and | :<br>: |  |

RATHBONE CLINIC
c/o Richard Rathbone (A Medical Corporation)
11323 Church Street
Clinton, LA 70722

SERVE ON REGISTERED AGENT:
c/o Richard Rathbone (A Medical Corporation)
11323 Church Street
Clinton, LA 70722

                    **Defendants.**

                         :
                         :
                         :
                         :
-----------------------------------X

**FILED *IN CAMERA* AND
UNDER SEAL PURSUANT
TO 31 U.S.C. § 3730(b)(2)**

**DO NOT ENTER IN
PACER**

**DO NOT PUT IN PRESS BOX**

## **TABLE OF CONTENTS**

I.  NATURE OF THE ACTION ............................................................................1

II.  JURISDICTION AND VENUE ...................................................................5

III.  PARTIES ........................................................................................................5

    A.  Plaintiffs..................................................................................................5

    B.  Relator......................................................................................................6

    C.  Defendants ...............................................................................................7

IV.  THE LAW: FEDERAL AND STATE FALSE CLAIMS ACTS.........................13

V.  FEDERAL  AND  LOUISIANA  STATE  HEALTHCARE  PROGRAM
REQUIREMENTS...........................................................................................16

VI.  THE STARK LAW.........................................................................................23

VII.  DEFENDANTS' WRONGFUL CONDUCT ........................................................25

    A.  Defendant Healthcare Centers Violated Medicaid Requirements By Denying
Services To Eligible Patients Solely Based On Their Medicaid Coverage ...........25

    B.  Defendants Baton Rouge General Medical Center, Dr. Venkat Banda And
HMG Physicians, LLC Violated The Stark Law .................................................34

    C.  Defendants Baton Rouge General Medical Center, Dr. Richard Rathbone And
Rathbone  Clinic  Violated  Suboxone  Requirements  Of  The  Drug  Addiction
Treatment Act ("DATA")..................................................................................40

VIII.  DAMAGES....................................................................................................42

COUNT I: VIOLATIONS OF THE FALSE CLAIMS ACT ...........................................43

COUNT II: VIOLATIONS OF THE FALSE CLAIMS ACT ...........................................44

COUNT III: VIOLATIONS OF THE FALSE CLAIMS ACT ...........................................45

PRAYER AS TO COUNTS I-III...................................................................................47

COUNT IV: VIOLATIONS OF THE FALSE CLAIMS ACT – STARK LAW
VIOLATIONS ...........................................................................................................48

COUNT V: VIOLATIONS OF THE FALSE CLAIMS ACT – STARK LAW
VIOLATIONS ............................................................................................................49

COUNT VI: VIOLATIONS OF THE FALSE CLAIMS ACT – STARK LAW
VIOLATIONS ............................................................................................................51

PRAYER AS TO COUNTS IV-VI........................................................................................53

COUNT VII: UNJUST ENRICHMENT .........................................................................54

PRAYER AS TO COUNT VII................................................................................................55

COUNT VIII: VIOLATIONS OF THE LOUISIANA MEDICAL ASSISTANCE
PROGRAMS INTEGRITY LAW ...........................................................................55

PRAYER AS TO COUNT VIII.............................................................................................57

*THE   REMAINDER   OF   THIS   PAGE   INTENTIONALLY   LEFT   BLANK*

## ORIGINAL COMPLAINT

**COMES NOW**, through the undersigned counsel, Relator Alicia C. Taylor, MD, on behalf of herself and the United States of America ("United States"), and the State of Louisiana brings this *qui tam* action under the False Claims Act, 31 U.S.C. §§ 3729 *et seq.* ("FCA") and the Stark Law, 42 U.S.C. § 1395nn to recover monetary damages, civil penalties, and all other remedies for violations of the Medicare and Medicaid Patient Protection Act of 1987, 42 U.S.C. § 1320a-7b, violations of the Drug Addiction Treatment Act ("DATA"), Tile 21, U.S.C. § 823(g) and similar State laws to recover treble damages, civil penalties, and other monetary relief for violations of the Federal healthcare programs of Medicare and Medicaid. In addition, Relator brings this action on behalf of herself and the State of Louisiana to recover statutory damages, civil penalties and other monetary relief for violations of Louisiana's Medical Assistance Program Integrity Law ("MAPIL"), LA Rev Stat § 46:437.

Relator hereby alleges as follows:

### I.  NATURE OF THE ACTION.

1.      This is a *qui tam* action under the Federal and Louisiana State False Claims Acts. The Federal False Claims Act was enacted in 1863 in response to "widespread corruption and fraud in the sales of supplies and provisions to the union government during the Civil War." 132 CONG. REC. H9382-03 (daily ed. Oct. 7, 1986) (statement of Rep. Glickman). The law allows a private person with knowledge of a fraud to bring an action in Federal district court for herself and for the United States and States and to share in any recovery. The party is known as a Relator, and the action that a Relator brings is called a *qui tam*.

1

2.     In this *qui tam*, Relator alleges that Defendants systemically have denied nonpregnant Medicaid patients in the greater Baton Rouge area covered services and access to women's healthcare specialists for routine and preventative treatment. This violation of Federal healthcare requirements has been exerted, since at least 2007, by the largest providers of gynecological services to the greater Baton Rouge area, Baton Rouge General Medical Center ("BRG"), Ochsner Health System and Woman's Hospital ("Woman's"), herein "Defendant Healthcare Centers."[1] This denial of covered services violates the basic Medicaid requirement that healthcare providers are not permitted to discriminate among the types of treatments administered to Medicaid beneficiaries. As detailed by the Louisiana Department of Health ("LDH"):

> When a provider does accept a recipient, the provider cannot choose which services will be provided. The same services must be offered to a Medicaid recipient as those offered to individuals not receiving Medicaid, provided the services are reimbursable by the Medicaid Program. Providers must treat Medicaid recipients equally in terms of scope, quality, duration and method of delivery of services (unless specifically limited by regulation).

LDH General Information and Administration Provider Manual, Section 1.1.

---

[1] There are other healthcare facilities in the area, but none of them provide inpatient OB/GYN services. Our Lady of the Lake Regional Medical Center ("OLOL") is Catholic and elects not to have a single gynecologist on staff and does not provide specialized women's services. Previously, Earl K. Long Hospital ("EKL"), a State Public Hospital, treated Medicaid patients and was considered the hospital for the uninsured. EKL served as a site for physician resident training and was a source of care for nonpregnant Medicaid patients. In 2014, Governor Bobby Jindal closed EKL and its patient care and medical education programs were moved to OLOL, which cannot provide specialized coverage for women's services. State Representative Regina Barrow of Baton Rouge raised this very issue of concern that uninsured women would not get the care they need despite a side deal that Woman's would provide obstetrics and gynecological care that OLOL does not perform. While this side deal attempts to address the treatment issues for pregnant women, it does not solve the patient issues remaining without EKL. Woman's does not have an Emergency Room and does not staff any trauma surgeons. Therefore, a pregnant woman with major trauma such as a gunshot wound is seen outside of the State's system of hospitals and sent to BRG or Ochsner Health System for care. Based on Jindal's arrangement, OLOL and Woman's split all of the Federal and State funds that previously funded EKL, a Disproportionate Share Hospital. Though the public funds previously followed the indigent or uninsured patient to their place of care for medical visits, these funds are now sent to Woman's and OLOL, regardless of where the patients are treated. In light of the fact that numerous patients cannot be treated at the designated medical centers, it seems inappropriate for Woman's and OLOL to glean all the Federal profits.

3.      This basic requirement is ratified in the Louisiana Medicaid Managed Care Organization Model Contract, which states that "[Louisiana Department of Health] considers mainstreaming of enrollees into the broader health delivery system to be important. The Contractor shall ensure that all network providers accept enrollees for treatment and that network providers do not intentionally segregate enrollees in any way from other persons receiving services." Louisiana Medicaid Managed Care Organization Model Contract § 2.9.9.1; *see also* § 2.4.12.1.3 ("The Contractor shall not discriminate against enrollees on the basis of their health history, health status, need for health care services or adverse change in health status...."); *see also* § 2.9.28.5 ("The Contractor's provider selection policies and procedures shall not discriminate against particular providers that serve high-risk populations or specialize in conditions that require costly treatment."); *see also* § 2.13.2.1; § 2.13.7.9; § 6.39. LDH goes further to specify that there should be no "[d]iscriminatory practices with regard to enrollees such as separate waiting rooms, separate appointment days, separate physical locations, or preference to private pay or Medicaid FFS patients."

4.      In substance, a provider cannot cherry-pick the types of covered services it will provide to Medicaid beneficiaries in order to inter alia increase its profits by refusing to provide certain types of treatments. Specific to gynecological patients, Louisiana Medicaid also clearly carves out even a referral exception so that healthcare providers accepting Medicaid cannot bypass the broad prohibition against any discrimination involving Medicaid gynecological patients.[2]

---

[2] GYN doctors are not required to treat all patients and may apply age limitations to their practice, such as not seeing pediatric patients, but that must be uniformly applied.

3

5.      As a result of Defendant's fraudulent course of conduct in violation of Federal and State laws, as alleged herein, Federal beneficiaries, as well as Federal and State healthcare programs are harmed in multiple ways. First, the Government programs have made substantial payments to Defendants to provide covered services to Medicaid patients even though Defendants then denied the paid-for services to those beneficiaries. And second, the denial of covered medically necessary routine and preventative gynecological services causes increased expenses to the Government programs through emergency room treatments, surgeries, therapy and at worst, long term care.

6.      Dr. Taylor additionally alleges violations of the Stark Law and the Drug Addiction Treatment Act ("DATA") by Defendant BRG. BRG maintained a financial relationship with Dr. Venkat Banda, HMG Physicians, LLC and Hospital Medicine Group, Inc. from 2012 to the present and that financial relationship violates the Stark Law, including when Dr. Banda and HMG Physicians, LLC refer and admit patients to BRG. Further, in the summer of 2019, BRG acquired Rathbone Clinic. Rathbone Clinic's sole physician, Dr. Richard Rathbone, is a Suboxone provider, who, now together with BRG, violates DATA restrictions by treating more than 2,000 Suboxone patients when the maximum permitted number of patients per physician is 275.

7.      This Complaint shall be filed *in camera* and under seal pursuant to 31 U.S.C. § 3730(b)(2). It will not be served on Defendants until the Court so orders. A disclosure of substantially all material evidence and information Relator possesses has been served on the Attorney General of the United States and the United States Attorney for the Middle District of Louisiana in advance of filing this Complaint pursuant to 31 U.S.C. § 3730(b)(2) and Fed. R. Civ. P. 4.

4

## II.    JURISDICTION AND VENUE.

8.    This Court possesses subject matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1345 and 31 U.S.C. §§ 3730 and 3732 because Relator seeks remedies on behalf of the United States for Defendants' violations of 31 U.S.C. § 3729, some of which occurred in the Middle District of Louisiana, and Defendants transact substantial business within the Middle District of Louisiana.

9.    This Court may exercise personal jurisdiction over Defendants under LA Code Civ. Pro. 6 (2018).

10.    This Court has pendant jurisdiction over the State claims pursuant to 31 U.S.C. § 3732(b) and 31 U.S.C. § 3730(e).

11.    This Complaint has been timely filed within the period prescribed by 31 U.S.C. § 3731(b). The allegations and transactions set forth in this Complaint have not been publicly disclosed prior to filing, in accordance with 31 U.S.C. § 3730(e).

12.    Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. §§ 1391(b) and (c) because the Defendants reside, transact business, and/or are qualified to do business in this District. In addition, during the period challenged by this action, Defendants committed the acts proscribed by the False Claims Act in this judicial District.

## III.    PARTIES.

### A.    Plaintiffs.

13.    Plaintiff United States of America brings this action by and through its administrative agency, the United States Department of Health and Human Services,

Centers for Medicare & Medicaid Services ("CMS"), which is responsible for the administration of all Federal health care programs.

14.    The State of Louisiana is named as Plaintiff pursuant to the Court's pendant jurisdiction under 31 U.S.C. § 3732(b) with respect to the related State's false claim statutes.

**B. Relator.**

15.    Relator Alicia C. Taylor, MD, MBA, FACOG, CSSGB has over 20 years of experience practicing as an OB/GYN in Louisiana, 13 years specifically in the Baton Rouge area. Dr. Taylor graduated from Harvard College in 1991 with a concentration in Psychology and Biology. In 1995 she earned her Medical Doctorate at LSU Medical Center – New Orleans and received her OB/GYN Residency Certificate in 1999 from Tulane University Medical Center – New Orleans. Additionally, in 2018, Dr. Taylor earned her Masters of Business Administration from LSU – Shreveport.

16.    From 2001-2005, Relator was in private practice OB/GYN at Methodist Hospital in New Orleans and from 1999-2001, Relator was a clinical physician OB/GYN for Ochsner Medical Center in Harahan, Louisiana. In the aftermath of Hurricane Katrina, Dr. Taylor left New Orleans and moved to Baton Rouge where she opened a private practice, which she ran from 2006 through 2015. During her time as a private practitioner, Relator had privileges at BRG and Woman's Hospital.

17.    By virtue of her positions and responsibilities at BRG, as well as her consistent interactions with staff and patients of BRG and the other Defendant Healthcare Centers, Relator obtained knowledge of Defendant Healthcare Centers' denial of access to women's healthcare specialists for routine and preventative services for nonpregnant

Medicaid patients in the greater Baton Rouge area. Relator further became aware of Defendants' fraudulent conduct regarding the Stark Law and DATA, alleged herein. This denial of access, unlawful referral practices and overprescribing of Suboxone resulted in Defendants filing fraudulent certifications of compliance in order to gain access to Federal and State funds. Pursuant to 31 U.S.C. § 3730(e)(4)(B), Relator is the "original source" of the information provided herein regarding Defendants' unlawful conduct. Relator has direct and independent knowledge of the allegations set forth herein. Relator states that the information concerning Defendants' misconduct was not disclosed publicly prior to her disclosure to the United States and the State of Louisiana.

### C. Defendants.

#### a. Baton Rouge General Medical Center.

18.    Baton Rouge General ("BRG") operates two locations, Bluebonnet and Mid City. General Health Systems is the parent company of a network of affiliated healthcare providers anchored by Baton Rouge General Medical Center's two facilities. BRG offers OB/GYN services and advertises these services on its website by stating:

> [w]e understand that women have unique healthcare needs and we believe you deserve access to a special place created specifically for you. At the same time, we want to provide unlimited access to the high quality, compassionate care and advanced technology you're accustomed to finding at Baton Rouge General.

The FYE 2016 BRG 990 organization mission is stated as "to provide high quality healthcare to the Baton Rouge area, regardless of patient race, creed, sex, national origin, age, or ability to pay and to promote the overall health of the community via wellness programs and medical education activities."

7

19.     BRG Bluebonnet employs six OB/GYN doctors who see approximately 15-20 patients daily, 4 days a week. BRG Mid City was staffed by one OB/GYN, Dr. Taylor, who saw 15 patients daily, approximately 4 days per week. Dr. Taylor launched the BRG Family Practice Residency Program, which she staffed one day each week to teach residents about Women's Health and to supervise certain office procedures. It was dubbed the "Women's Clinic". Dr. Taylor was the attending doctor of record for women who make appointments at the Women's Clinic. The catch was, a patient could only be seen at the residents' Women's Clinic through a Family Practice resident's internal referral (only patients already seen in their primary care physician ("PCP") clinic could be seen in the Women's Clinic regardless of insurance). The Family Practice Residency Program shares a building with BRG Mid City.

20.     BRG states that they accept multiple Medicaid plans, including Aetna Better Health, AmeriHealth Caritas, Healthy Blue, Louisiana Healthcare Connections and United Community Plan, categorized as Bayou Health Plans. It is headquartered in Baton Rouge, Louisiana and services the greater Baton Rouge metropolitan area, including East Baton Rouge Parish.

21.     Baton Rouge General Medical Center is organized under the laws of Louisiana as a Non-Profit Corporation, with its domicile address located at 8585 Picardy Avenue, Baton Rouge, LA 70809. It may be served through its registered agents, Kendall Johnson at 8585 Picardy Avenue, Baton Rouge, LA 70809 or Corey Doughty at 8490 Picardy Avenue, Baton Rouge, LA 70809.

8

b. Ochsner Health System.

22.    Ochsner Health System is Southeast Louisiana's largest nonprofit, multi-specialty healthcare delivery system with 40 owned, managed and affiliated hospitals and specialty hospitals across the region with fifteen located in Louisiana. Ochsner Health System is a part of Ochsner Health Network ("OHN") which is comprised of health systems, their employed physician groups and affiliated community physicians across the greater Gulf South. OHN estimates that it cares for nearly 1 million patients statewide every year. Ochsner Health System is a trade name granted to Ochsner Clinic Foundation, registered with the Louisiana Secretary of State in January 2018 though it was first used in December 2017.

23.    Ochsner Medical Center – Baton Rouge ("Ochsner") services the greater Baton Rouge metropolitan area, including East Baton Rouge Parish. Ochsner employs 8-10 OB/GYN doctors who each see approximately 15-20 patients daily. Ochsner advertises that they accept Medicaid among other insurance plans, and specifically identifies Aetna Better Health, AmeriHealth Caritas, Healthy Blue, Louisiana Healthcare Connections and United Healthcare Community Plan as accepted at Ochsner. Ochsner Health Systems is headquartered in Jefferson Parish, Louisiana, just outside New Orleans.

24.    In September 2019, Ochsner Health System and Lafayette General Health announced a plan to merge. The deal is expected to close in Spring 2020.

25.    Ochsner Clinic Foundation is organized under the laws of Louisiana as a Non-Profit Corporation, with its domicile address located at 1514 Jefferson Highway,

New Orleans, LA 70121. It may be served through its registered agent, CT Corporation System, at 3867 Plaza Tower Drive, Baton Rouge, LA 70816.

c. Woman's Hospital.

26.     Woman's Hospital ("Woman's") is one of the largest women's specialty hospitals in the United States. Woman's Hospital is a trade name granted to Woman's Hospital Foundation, registered with the Louisiana Secretary of State in February 2016 though it was first used in June 1982. It is a private, nonprofit organization with a stated mission to "improve the health of women and infants". The OB/GYN office at Woman's is Louisiana Women's Healthcare ("LWHA"), which employs 35 doctors on Woman's Hospital campus who see approximately 15-20 patients daily. Woman's further claims on its website to provide gynecological services and has links to numerous OB/GYN physicians with privileges at Woman's. The doctors are available on Woman's site to further the hospital's goal that those doctors will perform their procedures at Woman's. Woman's advertises that it accepts Medicaid among other insurance plans, and specifically identifies the following prepaid contracts: Aetna Better Health, AmeriHealth Caritas Louisiana, Healthy Blue (formerly AmeriGroup Real Solutions), Louisiana Healthcare Connections and UnitedHealthcare Community Plan. It is headquartered in Baton Rouge, Louisiana and services the greater Baton Rouge metropolitan area, including East Baton Rouge Parish.

27.     Woman's Hospital Foundation is organized under the laws of Louisiana as a Non-Profit Corporation, with its domicile address located at 100 Woman's Way, Baton Rouge, LA 70817. It may be served through its registered agents, Stephanie H. Anderson

at 100 Woman's Way, Baton Rouge, LA 70817 or Dr. Donna D. Fraiche at 450 Laurel Street, 20th Floor, Baton Rouge, LA 70809.

d.  Dr. Venkat Banda and HMG Physicians, LLC.

28.     Venkat Banda, MD, FACP earned his Doctor of Medicine from Siddhartha Medical College in Vijayawada, India. He completed his residency at St. Francis Hospital in Evanston, Illinois. Dr. Banda is Board Certified in Internal Medicine. He is the Program Director of BRG's Internal Medicine Residency Program and is an Assistant Professor at Tulane University School of Medicine.

29.     In 2005, Dr. Banda created a Hospitalist Group named Hospital Medicine Group, Inc. Hospitalists are physicians who solely admit and treat patients in the hospital. In 2007, Dr. Banda incorporated HMG Physicians, LLC ("HMG"). On information and belief, BRG acquired Hospital Medicine Group, Inc. around 2013/2014. This is corroborated by Louisiana Secretary of State records showing a single amendment filed for Hospital Medicine Group, Inc., which was a change in officer on January 31, 2014. The current officers of Hospital Medicine Group, Inc. are listed as Executive Vice President Kendall Johnson and President Edgardo Tenreiro, CFO and CEO of BRG, respectively. Further the current address of Hospital Medicine Group, Inc. is 8585 Picardy Avenue, which is BRG's Bluebonnet location. While running his own practice and HMG, Dr. Banda concurrently has been sitting on the board of BRG since at least 2012.

30.     Of note, Dr. Banda has also incorporated the following entities in

Louisiana:

- Venkat R. Banda, M.D. a Professional Medical Limited Liability Company (2004-2015)
- BRG Properties, LLC (2005-present)
- Hospital Medicine Group, LLC (September 2005-November 2005)
- Hospital Medicine Group, Inc. (2005-present)
- HMG Investments, LLC (2006-present)
- HMG Physicians, L.L.C. (2007-present)
- Hospital Medicine Group Services, LLC (2012-2017)
- F.O.B. Properties LLC (2014-present)
- HMG Long Term Care, LLC (2014-present)
- BRG 2015 LLC (2015-present)
- BRGHMG LLC (2016-present)

31.    HMG Physicians, LLC is organized under the laws of Louisiana as a Limited Liability Company, with its domicile address located at 8585 Picardy Avenue, Medical Tower 2, Suite 414, Baton Rouge, LA 70809. It may be served through its registered agent, Carolyn Braud, at 8585 Picardy Avenue, Medical Tower 2, Suite 414, Baton Rouge, LA 70809. Venkat Banda, M.D. is listed as an office with the address of 2645 Bocage Lake Drive, Baton Rouge, LA 70809.

e.    Dr. Richard Rathbone and Rathbone Clinic.

32.    Dr. Richard Faures Rathbone has been the sole physician at Rathbone Clinic since 1982, which was incorporated as Richard Rathbone (A Medical Corporation) with the Louisiana Secretary of State since January 1994. Dr. Rathbone's NPI number is 1831370444. He is licensed by the Louisiana State Board of Medicine as a physician (MD.016271) and as a supervising physician (SP.202553). He received his medical degree from Louisiana State University School of Medicine and did his internship at Earl K. Long Medical Center. Rathbone Clinic is located at 11323 Church Street in Clinton, LA. Dr. Rathbone serves as medical director at Gulf Coast Occupational Medicine and

has been associated with Lane Regional Medical Center. Around September 2019, the clinic was acquired by BRG and is currently affiliated with the Mid City Campus. BRG has assigned a doctor to assist Dr. Rathbone in seeing patients, which would be a total of two physicians for the Rathbone Clinic.

33.     Dr. Rathbone's specialty is family medicine, but he also treats pain management for opioid addiction. Since 2014, Dr. Rathbone has been identified as providing suboxone treatment in the National Opiate Addiction and Treatment Resources Directory. Further he is listed as a suboxone prescribing doctor in the Suboxone Directory.

34.     Richard Rathbone (A Medical Corporation) is organized under the laws of Louisiana as a business corporation, with its principal office address located at 11323 Church Street, Clinton, LA 70722. It may be served through its registered agent, Richard F. Rathbone, at 11323 Church Street, Clinton, LA 70722.

## IV.     THE LAW: FEDERAL AND STATE FALSE CLAIM ACTS.

35.     The False Claims Act, 31 U.S.C. §§ 3729-3733, provides, *inter alia*, that any person who (1) knowingly presents, or causes to be presented, to the United States a false or fraudulent claim for payment or approval; (2) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim made to the United States; or (3) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government, is liable

to the United States for a civil money penalty plus treble damages. 31 U.S.C. § 3729(a)(1)(A)-(B), (G).

36. The False Claims Act also provides that any person who conspires to violate any provision of the Act is liable to the United States for a civil money penalty plus treble damages. 31 U.S.C. § 3729(a)(1)(C).

37. Under the FCA, a statement is "false" if it is an affirmative misrepresentation or a material omission. *See United States ex rel. Kneepkins v. Gambro Healthcare, Inc.*, 115 F. Supp. 2d 35, 43 (D. Mass. 2000) (an "omitted material fact," such as the existence of illegal kickbacks, may be actionable under the FCA); *Luckey v. Baxter Healthcare Corp.*, 183 F.3d 730, 732 (7th Cir. 1999) (observing that a half-truth may amount to a false statement under the FCA in certain circumstances); *United States ex rel. Schwedt v. Planning Research Corp.*, 59 F.3d 196, 199 (D.C. Cir. 1995) (finding that false progress reports may constitute false statements under the FCA); *United States ex rel. Fry v. Guidant Corp.*, 2006 WL 2633740, at *10-11 (M.D. Tenn. Sept. 3, 2006) (finding representation was rendered false by concealment of material information). *Cf. Clearwater, Inc. v. Sebelius*, No. 09-13922, 2010 WL 3258871 (11th Cir. Aug. 19, 2010) (material omission of a healthcare provider on provider application submitted to Medicare automatically forfeits and excludes the provider from receiving any payment for services performed, even where the services actually were performed); W. Page Keeton, Prosser & Keeton on the Law of Torts § 106, at 738 (5th ed. 1984) ("[H]alf the truth may obviously amount to a lie, if it is understood to be the whole.").

38. The terms "knowing" and "knowingly" are defined to mean "that a person, with respect to information (1) has actual knowledge of the information; (2) acts in

deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1)(A)(i)-(iii). These terms "require no proof of specific intent to defraud." 31 U.S.C. § 3729(b)(1)(B).

39.    The term "claim" is defined to mean "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that (1) is presented to an officer, employee, or agent of the United States; or (2) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government (a) provides or has provided any portion of the money or property requested or demanded; or (b) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded . . . ." 31 U.S.C. § 3729(b)(2)(A)(i)-(ii).

40.    The term "material" means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property. 31 U.S.C. § 3729(b)(4).

41.    The State of Louisiana has also enacted a false claims statute, The Louisiana Medical Assistance Programs Integrity Law (La. Rev. Stat. Ann. §§ 6:4381 et seq), the provisions of which substantially mirror those of the Federal FCA. Relator asserts claims under the statute enacted by the State of Louisiana for the State portion of the Medicare and Medicaid false claims as stated herein. Relator's disclosure of substantially all material evidence and information Relator possesses will be served upon State officials as required by State law.

## V.   FEDERAL AND LOUISIANA STATE MEDICAID HEALTHCARE PROGRAM REQUIREMENTS.

42.     Relator makes claims under the Federal Medicaid Healthcare program. Title XIX of the Social Security Act ("Medicaid" or the "Medicaid Program") authorizes grants to States for medical assistance to children and blind, aged, and disabled individuals whose income and resources are not sufficient to meet the costs of necessary medical care. 42 U.S.C. § 1396; 42 C.F.R. § 430.0; *see* 42 U.S.C. §§ 1396-1396v. The Medicaid Program is jointly funded by the Federal Government and participating States. The amount of Federal funding in a State's program (Federal Financial Participation) is determined by a statutory formula set forth in 42 U.S.C. §§ 1396b(a) and 1396d(b).

43.     A State that elects to participate in the Medicaid Program must establish a plan for providing medical assistance to qualified beneficiaries. 42 U.S.C. § 1396a(a)-(b); *see* 42 C.F.R. § 430(A) & (B); CMS State Medicaid Manual § 13025. In exchange, the Federal Government, through CMS, pays to the State the Federal portion of the expenditures made by the State to providers, and ensures that the State complies with minimum standards in the administration of the Medicaid Program. 42 U.S.C. §§ 1396, 1396a, and 1396b.  Medicaid programs provide coverage for prescription drugs.

44.     CMS grants awards to States with approved State plans to cover the Federal share of Medicaid expenditures. 42 C.F.R. § 430.30(a). The amount a State receives at the beginning of a given quarter is based on an estimate made by CMS using information submitted to the United States by the State Medicaid agency. 42 U.S.C. § 1396b(d)(1); 42 C.F.R. § 430.30(a). Once the grant award is made, the State draws

16

Federal funds as needed to pay for the Federal share of disbursements. 42 C.F.R. § 430.30(d)(3). This draw is made through a commercial bank and the Federal Reserve system, against a continuing letter of credit. *Id.* at § 430.30(d)(4). The State then pays the portion of the claim not covered by the Federal share.

45.     For example, the State of Louisiana has elected to participate in the Medicaid Program and has established a Medicaid State Plan. The Bureau of Health Services Financing ("BHSF") is the State agency responsible for the Medicaid Program in Louisiana, which is run by the Louisiana Department of Health ("LDH"). The Health Standards Section ("HSS") of LDH is responsible for licensing all healthcare facilities in the State and has a Federal contract with CMS to conduct certification and complaint surveys for programs that are Medicaid certified. The Louisiana Medicaid (Title XIX) State Plan and Amendments serve as the officially recognized document describing the nature and scope of the State of Louisiana Medicaid Program. The State statutory citation granting LDH legal authority to administer the State plan is LA R.S.36:254D. Each part of the plan was developed by Louisiana and approved by the U.S. Department of Health and Human Services and CMS.

46.     As a general matter, Federal healthcare programs require every provider or supplier to ensure compliance with Federal laws governing the provision of healthcare in the United States. Defendant Healthcare Centers made false statements to and ultimately had false claims paid by the Federal and State healthcare programs.

47.     Providers who participate in Medicaid must certify compliance with State and Federal laws related to Medicaid in submitting claims for payment for services or supplies furnished to Medicaid beneficiaries. Many States require Medicaid providers,

including physicians and pharmacies, to affirmatively certify compliance with applicable Federal and State laws and regulations as conditions of payment. In Louisiana, the 1997 Regular Session of the legislature passed and the Governor signed into law the Medical Assistance Program Integrity Law ("MAPIL"), LSA-RS 46:437.1-46:440.3. MAPIL requires certifications of compliance with all Federal and State laws and regulations, among other agreements. These certifications are required upon initial application to become a Medicaid provider in Louisiana and are required to be re-certified with annual enrollment forms, as detailed in the PRISM Enrollment Packet for the Louisiana Medicaid Program. The Louisiana Medicaid PE-50 Provider Enrollment Form Addendum states in part:

---

**Certification of Claims (Paper & Electronic)**

23. I certify that all claims provided to Louisiana Medicaid recipients will be necessary, medically needed and will be rendered by me or under my personal supervision;

24. I understand that all claims submitted to Louisiana Medicaid will be paid and satisfied from federal and state funds, and that any falsification or concealment of a material fact, may be prosecuted under Federal and State laws;

25. I attest that all claims submitted under the conditions of this Agreement are certified to be true, accurate, and complete.

**Acknowledgement of Penalties for Violations of Medicaid Laws, Rules, Policies, and Contractual Provisions**

26. I understand and acknowledge that my participation as a provider in the Louisiana Medical Assistance Program is conditional upon my adherence to all applicable statutes, promulgated and unpromulgated rules, provisions contained within policy and provider manuals, and applicable provisions contained within contracts with, or pertaining to, Coordinated Care Networks or Managed Care Organizations, all of which have the force of law;

27. I understand and acknowledge that any violation of any of the aforementioned applicable statutes, promulgated and unpromulgated rules, provisions contained within policy and provider manuals, and applicable provisions contained within contracts with, or pertaining to, Coordinated Care Networks or Managed Care Organizations may result in sanctions levied against me including, but not limited to, recoupment of overpayments, withholding of payments pending, monetary penalties and/or fines, termination of this agreement, or exclusion for a minimum of five years from the Louisiana Medical Assistance Program.

_____

Print Name of Authorized Representative

_____        _____

Signature of Authorized Representative        Date of Signature

---

Significantly, claims falsely submitted to Medicaid in violation of State and Federal laws are not eligible for reimbursement and could result in the provider repaying funds wrongly obtained or even being terminated from the Medicaid program.

18

48.     Medicaid provides medical benefits to low-income individuals and families. As noted above, the Federal Government establishes the general rules for Medicaid and specific requirements are established by each State. The Louisiana Medicaid Program provides healthcare coverage through Medicaid to over a million residents – over 30% of the State's population. In the area at issue, the greater Baton Rouge metropolitan area, which includes East Baton Rouge Parish, the Louisiana Medicaid 2018 Annual Report states that 35-40% of the East Baton Rouge Parish population was enrolled in Medicaid and payments ranged from $5,001-$5,500 per recipient.

49.     As of 2016, there were 293,747 Medicaid beneficiaries in the greater Baton Rouge metropolitan area. According to LDH 57.3% of Medicaid beneficiaries State-wide are female, so roughly 167,500 patients are affected by this discrimination every year. The 2017/2018 Annual Report has female beneficiaries comprising 56.7% of Medicaid enrollees and further indicates that for children 18 and under the male/female enrollees are almost evenly split, but for enrollees ages 19 and above, females account for 62.6% of enrollment. LDH claims this can most likely be explained by (i) the pregnant women's program, through which one is deemed eligible for Medicaid enrollment from pregnancy through two months postpartum; (ii) a disproportionate number of female enrollees in very low-income households; and (iii) longer life expectancy of females. These explanations account for the large swath of patients eligible for women's services who are being denied the very treatment they both are entitled to and require.

50.     In 2016, Louisiana expanded Medicaid coverage through the Affordable Care Act to include adults ages 19-64 with a household income up to 138% of the Federal

19

poverty level. The Adult Group began enrollment in June 2016, with enrollees beginning to receive services in July 2016. This group accounts for approximately 27% of Louisiana Medicaid enrollment. Adult Group enrollees receive care through Medicaid's managed care program, Healthy Louisiana. This includes full Medicaid benefits as well as access to the value-added benefits provided by the managed care organizations that deliver care. In addition to the Adult Group, nonpregnant females could qualify for Medicaid through multiple categories, including the following:

- CHAMP – Low-Income Children: coverage from birth through a child's 19th birthday based on income limit of 142% of poverty
- LaCHIP (Title XXI): coverage from birth through a child's 19th birthday based on poverty income greater than 142% and up to 212% of poverty
- LaCHIP Affordable Plan (LAP): coverage from birth through a child's 19th birthday based on poverty income greater than 212% and up to 250% of poverty
- CWO Children: children under 18 in Foster Care programs with eligibility determined by Child Welfare Office
- Parent/Caretaker Relative (PCR) Group: parent/caretaker relative who lives with a dependent child based on income limit of 19% poverty
- MAGI – Related Medically Needy: children and families who have income below regular Medically Needy income standards and are ineligible for other MAGI-related groups based on income limit of 15% of poverty (individuals and couples)
- Former Foster Children: individuals ages 18-26 released from the Foster Care program due to turning age 18 with no income limit

51. The managed healthcare delivery system in Louisiana, through which the majority of Medicaid enrollees receive healthcare, is known as Healthy Louisiana (formerly known as Bayou Health). Out of the total 1,856,480 unduplicated individuals enrolled in Louisiana Medicaid, 1,720,038 were enrolled in Healthy Louisiana.

52. The managed care program uses a Per-Member-Per-Month ("PMPM") payment model. Louisiana Medicaid pays managed care organizations ("MCOs") a monthly fee to manage the health needs of the managed care enrolled population. Healthy Louisiana MCOs also receive a one-time kick-payment for each obstetrical delivery. As

opposed to payment for deliveries, which are done upon the actual delivery, payments for general Medicaid are paid monthly based on enrollees, not based on actual services rendered. Managed care providers are paid by the MCOs rather than being paid directly by Louisiana Medicaid. Services provided to managed care enrollees are submitted to Medicaid as encounters.

53.     Healthy Louisiana Plans provide Medicaid-covered benefits and services to enrolled members in exchange for a monthly PMPM fee for each member. All core benefits and services are provided by all plans. Healthy Louisiana Payments for females in East Baton Rouge Parish for 2017/2018 totaled over $389.6 million for 90,274 female Healthy Louisiana Recipients.

54.     Louisiana Medicaid Vendor Program Expenditures for 2017/2018 were $11.6 billion. The effective overall State match rate was approximately 27.81% while the Federal match rate was approximately 72.19%.

**Table 2:** Medical Vendor Program Expenditures Means of Finance by State Fiscal Year

| Financing Category | 2015/16 Expenditures | Percent | 2016/17 Expenditures | Percent | 2017/18 Expenditures | Percent |
|---|---|---|---|---|---|---|
| State General Fund | $2,053,493,691 | 24.69% | $1,959,650,134 | 18.42% | $1,990,841,667 | 17.17% |
| Other Finance | $792,766,577 | 9.53% | $1,243,037,002 | 11.69% | 1,234,233,097 | 10.64% |
| Total State Match | $2,846,260,268 | 34.22% | $3,202,687,136 | 30.11% | 3,225,074,764 | 27.81% |
| Federal Funds | $5,471,133,788 | 65.78% | $7,433,432,362 | 69.89% | 8,371,255,054 | 72.19% |
| **Total** | **$8,317,394,056** | **100.00%** | **$10,636,119,498** | **100.00%** | **$11,596,329,818** | **100.00%** |

**Table 3:** Medical Vendor Program Expenditures for Budget Programs by State Fiscal Year

| Financing Category | 2015/16 Expenditures | Percent | 2016/17 Expenditures | Percent | 2017/18 Expenditures | Percent |
|---|---|---|---|---|---|---|
| Private Providers | $6,560,351,212 | 78.88% | $8,943,227,291 | 84.08% | $9,805,173,114 | 84.55% |
| Public Providers | $196,233,426 | 2.36% | $195,137,745 | 1.83% | 184,630,528 | 1.59% |
| Buy-ins and Supplements | $454,301,806 | 5.46% | $459,706,112 | 4.32% | 515,978,684 | 4.45% |
| Uncompensated Care | $1,106,507,612 | 13.30% | $1,038,048,350 | 9.76% | 1,090,547,492 | 9.40% |
| **Total** | **$8,317,394,056** | **100.00%** | **$10,636,119,498** | **100.00%** | **$11,596,329,818** | **100.00%** |

**Table 4:** Medical Vendor Administration Expenditures Means of Finance by State Fiscal Year

| Financing Category | 2015/16 Expenditures | Percent | 2016/17 Expenditures | Percent | 2017/18 Expenditures | Percent |
|---|---|---|---|---|---|---|
| State General Fund | $78,093,014 | 31.37% | $88,091,296 | 27.05% | $119,380,919 | 33.87% |
| Other Finance | $2,542,965 | 1.02% | $2,411,289 | 0.74% | 3,723,576 | 1.06% |
| Total State Match | $80,635,979 | 32.39% | $90,502,585 | 27.79% | 123,104,495 | 34.93% |
| Federal Funds | $168,340,789 | 67.61% | $235,120,845 | 72.21% | 229,317,024 | 65.07% |
| **Total** | **$248,976,768** | **100.00%** | **$325,623,430** | **100.00%** | **$352,421,519** | **100.00%** |

55.    Notably for 2017/2018, over $5.2 billion was spent on 725,722 female enrollees over the age of 15. During this same time period there were 737,972 recipients. An enrollee is a Medicaid eligible person who applied for and was approved by the Medicaid program to receive benefits regardless of whether he or she received any service and/or any claims or managed care encounters were filed on his or her behalf. A recipient is an enrollee with at least one Per-Member-Per-Month ("PMPM") payment paid on his or her behalf during the time period involved, but the recipient may not have been enrolled during the time the PMPM or claim was paid.

## VI.    THE STARK LAW

56.     Enacted as amendments to the Social Security Act, the Stark Law prohibits a hospital from billing Medicare and Medicaid for certain services referred by physicians with whom the hospital has an improper financial arrangement, including the payment of compensation that exceeds fair market value of the services actually provided by the physician and the provision of free or below-market rent and office staff.[3] 42 U.S.C. §§ 1395nn. The Stark law is intended to ensure that physicians' medical judgments are not compromised by improper financial incentives and instead are based on the best interests of their patients.

57.     The Stark Law is a strict liability statute and was designed specifically to prevent losses that might be suffered by the Medicare and Medicaid program due to questionable utilization of designated health services. In particular, the Stark Law provides, in pertinent part:

> (a) In general. Except as provided in subsection (b) of this section, if a physician....has a financial relationship with an entity specified in paragraph (2), then –
>
> (A) The physician may not make a referral to the entity for the furnishing of designated health services for which payment otherwise may be made under this subchapter, and
>
> (B) The entity may not present or cause to be presented a claim under this subchapter or bill to any individual, third party payor, or other entity for designated health services furnished pursuant to a referral prohibited under subparagraph (A).

42 U.S.C. § 1395nn(a)(1).

---

[3] Initially enacted for Medicare patients, § 1903(s) (42 U.S.C. §1396b) of the Social Security Act extended the referral prohibition to the Medicaid program.

58.    "Designated health services" include inpatient and outpatient hospital services.  42  U.S.C.  §  1395nn(h)(6).  A  "financial  relationship"  includes ownership/investment interests and compensation arrangements between a physician and an entity that furnishes DHS. Such arrangements and the associated financial relationships may be either direct or indirect. *See* 42 U.S.C. §§ 1395nn(h)(1)(A) and (h)(1)(B).

59.    The Stark Law explicitly states that Medicaid will not pay for designated health services billed by a healthcare provider when the designated health services resulted from a prohibited referral. *See* 42 U.S.C. § 1395nn(g)(1). In addition, the regulations implementing the Stark Law expressly require that any entity collecting payment for a healthcare service "performed under a prohibited referral must refund all collected amounts on a timely basis." 42 C.F.R. § 411.353 (2006).

60.    The Stark Law provides exceptions, including (i) designated health services furnished personally by the referring physician or another physician in the same group practice in the referring physician's primary facility or another building used by the group practice ("in-office ancillary services"); (ii) a compensation arrangement in writing for a specific timeframe and is a commercially reasonable transaction that meets the "safe harbors" under the Anti-Kickback Statute ("fair market compensation"); (iii) indirect compensation arrangement between a physician and an entity if the compensation received by the referring physician is of fair market value, does not take into account the value or volume of referrals and is set out in writing and signed by the parties ("indirect compensation"); and (iv) payment of non-monetary compensation to a physician of up to $300 per year, if the physician did not solicit that compensation and it

24

does not take into account the volume or value of referrals ("non-monetary compensation").

61.    Because Dr. Banda is employed by BRG and owns HMG Physicians, LLC, which refers and admits patients to BRG for designated health services, Dr. Banda and HMG's financial relationship with BRG violates the Stark Law.

## VII.    DEFENDANTS' WRONGFUL CONDUCT.

### A. Defendant Healthcare Centers Violated Medicaid Requirements By Denying Services to Eligible Patients Solely Based on Their Medicaid Coverage.

62.    From at least 2007 to the present, Defendant Healthcare Centers, the 3 providers of OB/GYN services to the Baton Rouge metropolitan area, have denied nonpregnant Medicaid patients access to women's healthcare specialists for routine and preventative women's healthcare services. This denial of services is fostered even though Medicaid does not permit its providers to discriminate against patients.

63.    Specific to the gynecological patients, Louisiana Medicaid clearly carves out even a referral exception, leaving these institutions with no legal right to discriminate against Medicaid gynecological patients. Below is an excerpt of a sample referral form for Community Health Solutions of Louisiana, a Medicaid provider, which clearly states that access to women's health specialists for routine and preventative healthcare services and prenatal care do not require referrals.

| Referrals are NOT REQUIRED in the following situations: |
| --- |
| • Access to women's health specialists for routine and preventive women's healthcare services and prenatal care |
| • Laboratory services |
| • X-Ray images (i.e.-plain films) <br>   o Prior-authorization is required for diagnostic imaging studies, such as MRI's, CT scans |
| • Low level (Level 1 and Level 2) Emergency Room visits |
| • Urgent Care Clinic visits |

64.     Though no referral is required, Defendant Healthcare Centers often only see patients who are referred by PCPs on Defendant Healthcare Centers' staff or not at all. Relator notes that every day she was at BRG Mid City she would hear schedulers tell people over the phone that they need an in-house PCP referral for an appointment.

65.     The practice of denying coverage to nonpregnant Medicaid patients is at times so blatant that relator has observed notes from doctors in patient files stating "we don't accept your insurance" once post-partum appointments were completed. Relator has further observed a Woman's form in 2010 or 2012 that stated post-pregnancy, Medicaid was no longer accepted.

66.     In a less obvious, but more frequently utilized denial of service, nonpregnant Medicaid patients are told they can be seen in 6-8 months for a check-up regardless of prior availability. Relator has been told this by patients and has personally seen earlier openings in the booking system. Further, on August 19, 2019, Relator overheard BRG scheduler, Carla Hopkins, having a conversation with the Denham Springs Clinic referral coordinator and complaining that this patient must receive an appointment at Mid City because the office had "tried everywhere" for an appointment and was unsuccessful. After reluctantly scheduling the Medicaid patient months out, BRG then either (1) finds a reason to cancel the appointment, often it will be due to a

non-in-house PCP referral, which is not required by Medicaid, or (2) reschedules the appointment a few times in an attempt to discourage the patient's attendance at the appointment. (*See Patients #14 and 15 summary below*)

67.    The reason for this is simply money. Medicaid pays $45 for a gynecological "well woman" exam while private insurance pays approximately $180 for the same exam. The difference in payment for obstetrical exams and delivery is smaller with Medicaid paying approximately $1200 and private insurance paying $2500.

68.    Relator raised the issue of denying appointments to nonpregnant Medicaid patients with Saundra Wilson, the operations manager for the BRG clinics. At Relator's urging, Ms. Wilson called a Louisiana Medicaid representative who confirmed that Medicaid does not permit any discrimination against nonpregnant Medicaid patients. Ms. Wilson still pushed back against Relator's request to treat these patients but agreed to allow appointments to be booked for nonpregnant Medicaid patients over 40 years of age.

69.    Following are specific examples of patients who were denied women's health services based solely on their status as nonpregnant Medicaid patients.[4] Each case represents an established or scheduled patient in Relator's office. eClinical Works is the office electronic medical record which allowed Relator to review doctor's notes and the patient's previous encounter notes from other providers. In some instances the record contains "scanned in" chart records which represent records received from outside offices (who previously cared for the patient) after a release of information request was placed in order for the requesting provider to review more of the patient's history. Relator also accessed the BRG charting system, Paragon, in order to read the emergency room visit

---

[4] The patients' names have been removed to protect their privacy. Further information can be provided upon request.

notes and laboratories. These write ups were summaries of doctor, nurse and staff documentations during the patients' encounters.

- **Patient #1** (Insurance: Medicare (primary); Medicaid (secondary)). 57 year old female presented to her primary care at Our Lady of the Lake Clinic ("OLOL") on 11/30/2016. Patient #1 complained of vaginal bleeding after being in menopause without periods for 5 years and abdominal pain. On 05/03/2017 she was seen in OLOL's emergency room with same complaints by Dr. Yushen Lee and was found to be severely anemic with large uterine fibroids. Dr. Lee makes note of attempt to call every gynecologist at Woman's Hospital and could not find any provider to accept Patient #1's insurance. Dr. Lee then referred Patient #1 to LSU Women's Clinic at Woman's Hospital who declined to schedule her for an appointment as they also would not accept her plan. Dr. Lee's referral staff then referred Patient #1 to Dr. Taylor's office who on 11/03/2017 diagnosed Patient #1 with frank cervical cancer with large mass visible at her cervix. Patient #1 was then re-referred back to Woman's Hospital to see the GYN/Oncologist, Dr. Giles Fort, for treatment of her cervical cancer. She was seen at the cancer clinic on 11/16/2017 and shortly thereafter began chemo/radiation treatment.[5] Patient #1 is doing well post treatment with a very good response. She is dealing reasonably with the post chemo neuropathy which makes her incapable of walking without a leg brace.

- **Patient #2** (Insurance: Healthy Blue). 61 year old female with postmenopausal bleeding for 10 years, reported that she had never stopped having periods since menopause which had occurred in 2007. Patient #2 sporadically attempted to make appointments with local GYN physicians over those years but was told no office accepted Medicaid unless for pregnancy care. She had begun to bleed heavier with passage of clots over the preceding 2-3 years before 2017. In September 2017, Patient #2 sought emergency room treatment at BRG secondary to abdominal pain and continued heavy vaginal bleeding. Pelvic ultrasound at the time revealed multiple large (up to 8cm each) uterine fibroids and poor visualization of other pelvic structures. The emergency department attempted to make an outpatient appointment with Dr. Joann Barrios (OB/GYN) but was told this was not possible without a referral from a primary care doctor who was employed by BRG. The emergency room staff was not successful in gaining any other gynecology appointments for follow up at that time. Patient #2 was discharged from the emergency room the same day with instruction to seek assistance in gaining a referral to an OB/GYN doctor from her primary care provider. Patient #2 attended an appointment with her primary care provider on 10/17/2017 and was able to gain an appointment with Dr. Taylor at the BRG Mid City location scheduled for 12/4/2017. Patient #2's symptoms

---

[5] Hospitals/Clinics with a GYN Oncologist on staff will see Medicaid and Medicare patients in the office, but will not schedule any patient without a biopsy proven gynecological cancer along with a physician's referral, therefore, the patient must be seen by a general gynecologist first. In this case, only after Patient #1 was seen by Relator, who did work up to obtain tissue diagnosis, would an oncologist accept her for treatment.

worsened and she was admitted to BRG on 11/25/2017 with severe abdominal pain and heavy periods. She was diagnosed with gallbladder cancer and because this is closely associated with endometrial cancer and in light of her longstanding postmenopausal bleeding complaint (a harbinger of endometrial cancer), a gynecologic malignancy was suspected. A GYN Oncologist was consulted during this hospitalization to evaluate Patient #2 as an inpatient. The GYN Oncologist suspected possible coexisting endometrial cancer and recommended to begin further investigation. Unfortunately, at this admission, Patient #2's condition rapidly deteriorated. Patient #2 was overcome with tremendous weakness and was soon unable to walk or even to sit up unassisted in the hospital bed. She was diagnosed as terminal with 1) an incarcerated ventral hernia, 2) adenocarcinoma of the gallbladder (porcelain gallbladder), 3) probable endometrial cancer (never investigated). Patient #2 was discharged to a Hospice/Palliative Care Center in 12/2017 due to her poor prognosis and is now deceased. Patient #2's gynecology appointment with Dr. Taylor was cancelled.

- **Patient #3** (Insurance: Aetna Better Health). 37 year old female had her initial prenatal visit on 09/25/2017 with Dr. Taylor (OB/GYN) where a routine pap smear was performed showing severe abnormality. Patient #3 continued with her care and pregnancy undergoing further work up and observation of her severely abnormal pap smear with limited biopsies as is standard of care during pregnancy. She went on to deliver her baby and returned to Dr. Taylor's office for her postdelivery visit on 05/14/2018. At that visit, Patient #3 was counseled to return to the office for further and more aggressive evaluation and treatment of her cervical abnormality now that she was no longer pregnant. Patient #3 was counseled to return 10-12 weeks after delivery for this care. Patient #3 failed to make follow up appointment prior to leaving the office that day and was unable to make return appointment due to her nonpregnant state with Medicaid insurance. On 05/17/2018 the medical record reflects that Dr. Taylor's medical assistant phoned Patient #3 to remind her to make another appointment for cancer prevention follow up. Notations in the record reflect that Patient #3 attempted to make an appointment in 11/2018 but was unable to secure an appointment with Dr. Taylor due to her nonpregnant state with Medicaid.

- **Patient #4** (Insurance: United Healthcare Community Care). 42 year old female patient with heavy periods and pelvic pain had private insurance and was followed by Dr. Carol Patin (OB/GYN) in Baton Rouge in 2016.[6] Patient #4 changed from private insurance to a Medicaid plan and was dismissed from the care of Dr. Patin as her new insurance was not accepted unless she was pregnant. Patient #4 continued to report pain and bleeding as debilitating and attempted to find another GYN doctor. She reports calling every OB/GYN doctor's office in Baton Rouge and was told that either her insurance was not accepted unless pregnant or was placed on a waiting list for up to a year's time. Patient #4 reported being frustrated with her lack of access to the care she needed and was very depressed with severe anxiety and was expressing suicidal thoughts. She was seen in Dr. Taylor's office crying due to continued pain

---

[6] Dr. Carol Patin is a private physician who is not employed by any hospital.

29

and bleeding in 07/2018.[7] Patient #4 was assured that she would be cared for at Dr. Taylor's office and underwent a hysterectomy with ovarian cystectomy. She was seen for follow up on 08/10/2018 pain free without further bleeding and happy saying she had renewed vigor for life with her 10 year old son.

- **Patient #5** (Insurance: Healthy Blue). 59 year old female reports many months of postmenopausal bleeding, therefore, in 02/2018 she attempted to make an appointment at Dr. Taylor's office but was told that she would not be scheduled due to her nonpregnant state with Medicaid unless she had a primary care provider in the BRG system. Patient #5 then made an appointment 03/2018 with medicine Dr. May at BRG clinics who provided Patient #5 with the referral to gynecology. Dr. May's office on 03/12/2018 was able to secure an appointment to evaluate Patient #5's potentially cancerous condition but the appointment was scheduled with Dr. Taylor for 08/27/2018. The office appointment record reflects daily and multiple unfilled appointments with Dr. Taylor continuously from 01/2018 until 09/2018. Patient #5 was seen at Dr. Taylor's office 08/27/2018 where she underwent biopsies and radiologic evaluation which were reassuring but remains under close surveillance.

- **Patient #6** (Insurance: Louisiana Healthcare Connections). 40 year old female had an uncomplicated delivery 10/05/2018 with Dr. Jolie Bourgeois at Woman's Hospital. Patient #6 reports continued vaginal bleeding for 10 weeks after delivery but was unable to make an appointment with Dr. Bourgeois for follow up after 8 weeks because Dr. Bourgeois does not take Medicaid after the postpartum period which was defined as 8 weeks after delivery. Patient #6 attempted to make other gynecology appointments but was unable to secure an appointment with a gynecologist in Baton Rouge due to her nonpregnant state with Medicaid. Patient #6 had chosen the Family Practice Resident Clinic at BRG as her primary care provider and on 11/30/2018 sought treatment there for her gynecologic issues. She continues with the Family Practice residents to date with continuing medical attempts at diagnosing and treating her condition.

- **Patient #7** (Insurance: Healthy Blue). 42 year old female desired birth control and had history of rectal bleeding and prolapse. Patient #7 was seen on 09/24/2018 by her primary care BRG doctor, Leola Carter, where her work up for her symptoms began and a pap smear was performed. The pap smear resulted with cell abnormality and high risk HPV infection. A referral to OB/GYN was forwarded to their office referral specialist. On 10/24/2018 there is a complaint note by Dr. McClure (Internal Medicine) in the record that no OB/GYN office in Baton Rouge had responded to their office's request for an appointment. The record also notes that Patient #7's previous OB/GYN physician at Woman's Hospital who delivered her last child required her to have a written prescription referral before further follow up or contraception follow up would be scheduled in 2013 as she was no longer pregnant with Medicaid insurance. An appointment was secured and occurred with Dr. Taylor on 12/12/2018 at which Patient #7 underwent a colposcopic procedure to evaluate her

---

[7] Patient #4 was able to get an appointment with Dr. Taylor by being "over 40 regardless of insurance" – a concession Dr. Taylor lobbied for at her office and was granted.

cervix. Patient #7's condition requires continued close follow up, however notations in the record subsequent to her appointment by Dr. May's (Internal Medicine) office indicate that Patient #7 has been directed by Dr. Taylor's (GYN) office staff that she must obtain continued contraception and follow up with her primary care doctor. Patient #7 has not been seen by a gynecologist since her initial colposcopy appointment with Dr. Taylor in December of 2018.

- **Patient #8** (Insurance: Louisiana Healthcare Connections). 38 year old female with CIN III (carcinoma in situ) on biopsy in 2012 had cervical conization surgery at Ochsner Hospital in Baton Rouge when she had private insurance. Patient #8 was followed by Ochsner Clinic in Baton Rouge with continued abnormal pap smears and HPV until 2015 when she lost her private insurance and obtained Medicaid. Previously, she had been told by her gynecologist that she needed a "laser procedure" on her cervix. She was unable to find a gynecologist who would accept Medicaid while not pregnant. In March of 2018, Patient #8 was seen in the BRG Emergency Room with significant vaginal bleeding and with abdominal and back pain. She was given IV fluids and discharged with plan for establishment of care with a primary care provider for follow up as referrals were difficult except through networked primary care doctors. Patient #8 made an appointment and established care with a BRG primary care doctor and was referred to Dr. Taylor's office (OB/GYN) with an appointment scheduled 04/26/2019. This appointment was cancelled by the OB/GYN office for reasons not found in the medical record.[8] The primary care provider called the OB/GYN office in alarm to inquire as to why the appointment was cancelled. According to the primary care office notes, no reason was offered for the cancellation but Dr. Taylor's scheduler reported that they had been trying to reschedule patient but had not had success in reaching Patient #8. A new appointment then appeared on the Dr. Taylor's schedule for 08/20/2018 with a notation that Patient #8 "no showed" for the appointment.

- **Patient #9** (Insurance: United Healthcare Community Plan). 50 year old female with known very large fibroid uterus and severe anemia was cared for by Dr. Lin Dang at Woman's Hospital and, according to Patient #9, was scheduled for a hysterectomy due to excessive vaginal bleeding and pain in 10/2018. She reports that she would often use more than 1 pad per hour and have periods for weeks at a time which ultimately caused her to lose her truck driving job. Patient #9 lost her private insurance and obtained Medicaid insurance upon her employment termination in 10/2018. She reports she was promptly cancelled from the surgery schedule by Dr. Dang and informed that she must find a provider that accepted Medicaid for further care. Patient #9 became very depressed as she was unable to find any gynecologist in Baton Rouge who would accept her Medicaid insurance while not pregnant and contemplated suicide due to her melancholy and nearly constant vaginal bleeding.

---

[8] Patient #8 did not show for the appointment on 04/26/2019 but there is not an appointment record indicating that she was ever contacted or notified of the appointment. Potentially this could be because the appointment was not real, which is not an unusual circumstance. The office assistant manager or scheduling clerk would have done this to avoid actually scheduling a Medicaid patient after being questioned without the denial of services being detected.

She reports that a friend directed her to the office of Dr. Taylor (OB/GYN) where she underwent a hysterectomy on 04/25/2019 with a very large fibroid uterus removed. Patient #9 was seen for follow up 05/17/2019 where she was insistent on a release statement to work. She was symptom free and eager to reenter the work force as she had been hired to drive trucks again.

- **Patient #10** (Insurance: United Healthcare Community Plan). 20 year old female with cystic ovaries and heavy periods causing severe anemia was followed by primary care Dr. Kenyatta Shamlin. Patient #10 underwent an IV iron transfusion to treat anemia and on 06/05/2019 she was seen by PCP during follow up where attempts to refer her to a gynecologist who would accept her Medicaid insurance were unsuccessful.[9] An appointment was eventually made for 07/18/2019 with BRG Dr. Taylor (OB/GYN) which was cancelled 07/15/2019 with notation that private insurance (UMR) was secondary to Medicaid so "coordination of benefits" must occur prior to scheduling. Patient #10 then was referred again with appointment made at Dr. Taylor's office for 08/15/2019 which was subsequently cancelled on 08/15/2019 by BRG scheduling staff saying nonpregnant Medicaid referrals are only accepted from a primary care provider who is employed by BRG. As of September 2019, Patient #10 has not had follow up with a gynecologist in Baton Rouge.[10]

- **Patient #11** (Insurance: Amerihealth Caritas). 27 year old female established care with Dr. Pamela Lewis (OB/GYN) at Woman's during her pregnancy and was diagnosed with abnormal pap smears during that time. She was successfully delivered in 10/2018 by Dr. Lewis after which Patient #11 states she was dismissed from care due to her Medicaid insurance which was not accepted while nonpregnant. [Patient #11 also had a history of migraines with aura and after delivery was seen by a primary care doctor who prescribed oral contraception (contra-indicated due to increase in stroke risk)]. Patient #11 was seen by another PCP, Dr. Katherine May, in 08/2019, who made a clinical notation that Patient #11 was seen by a Woman's doctor while pregnant and needed to find a new physician for follow up of her abnormal pap smear and contraception needs. Dr. May is a staff physician at BRG and made an internal referral to Dr. Taylor's office where Patient #11 was seen in 08/2019 where care is ongoing.

- **Patient #12** (Insurance: Amerihealth Caritas). 47 year old female seen at Our Lady of the Lake ER 09/2018 complaining of feeling lightheaded and heavy periods for at least 10 years. Patient reported previous blood transfusion due to similar complaints 2

---

[9] Patient #10's PCP, Dr. Kenyatta Shamlin, has been in practice for over 15 years and has never made referrals to Relator's office. The last scanned-in patient encounter/referral from Dr. Shamlin is first given to an office scheduler to attempt to find a specialist. The PCP referral note has a stamp indicating that it was initially faxed to Dr. Patin (GYN) then referred to relator sometime after.

[10] BRG scheduling notes (Scheduler: Camilla Paul) in eClincal Works states that Patient #10 was cancelled due to a lack of an in-house PCP referral. Relator was unable to locate a pending appointment in eClinical Works for any BRG gynecologist nor any mention of a gynecologist in subsequent BRG emergency room notes. Relator notes that she cannot check Woman's affiliated clinics or Ochsner Clinic appointment records, but neither has historically accepted Medicaid nonpregnant patients and if they did, a referral to Relator's office would not have been attempted in the first place.

years prior. Patient #12 had delivered baby at Woman's Hospital in 2015 by LSU Resident's Clinic. In ER patient had Hgb of 4 (less than 7 is considered critical) and received blood transfusion. Patient discharged with instructions to follow up with GYN. Patient #12 had no GYN follow up until she began working as paramedic and acquired Blue Cross. She then made an appointment at Dr. Taylor's office and was seen 09/2019. She had not had a follow up for a year since her last blood transfusion and continued to have the same complaints of heavy periods and was fearful of repeat of severe anemia. When asked why she did not seek care before the OLOL ER visit and again after the latest blood transfusion, Patient #12 explained that she had Medicaid insurance and tried "every office" in Baton Rouge but could not get an appointment because she had "bad insurance". She says she was able to get an appointment at LSU Resident's clinic but it was scheduled a year in the future. Patient #12 explained that when she started working "a good job with insurance" she was able to make an appointment with Relator for treatment.

- **Patient #13** (Insurance: United Healthcare Community Care). 19 year old female patient with complaints of pelvic and abdominal pain was seen by her primary care doctor Christopher Smith, on 08/19/2019, and after being unable to find gynecologist who would accept Patient #13 as a patient, she was referred to gynecologist Dr. Taylor. Despite daily and assorted appointments available (sometimes entire day availability), Patient #13 was scheduled for an appointment on 01/02/2020. It was expected that this appointment would be cancelled prior to that date as her PCP is not a BRG physician.[11]

- **Patients #14 and 15** (Insurance: Blue Cross). Patient #14 is a 56 years old female who presented to Dr. Taylor's office on 07/31/2019 at Baton Rouge General Mid City for concerns about lingering breast pain. Her daughter, Patient #15, was last seen at Relator's office 01/31/2019 for well woman exam. Patients #14 and 15 have been Relator's patients for more than 8 years. For Patient #14's previous visits, she had also made an appointment for her daughter, Patient #15, at the same time. All of her family had shared the same Blue Cross family policy until this year. This year, Patient #14's daughter, Patient #15, turned 26 and was age excluded from the family policy, so obtained Medicaid insurance for herself. Patient #14 complained (unsolicited) at her routine office visit that she had always made gynecology appointments for herself and her daughter at the same time for years without difficulty but this time, she was given an appointment within 2 weeks for herself but was told that the first available appointment for her daughter was 6 months into the future because of her Medicaid insurance. Patient #14 complained that she had protested to the receptionist explaining that her daughter was having some difficulty with her birth control (Mirena IUD, which Relator had inserted in 03/ 2018) and needed to be seen but was told that this did not change schedule availability for Medicaid. Patient #14 declined to make a 6 month future appointment for her daughter.

---

[11] Since Relator left her position, it is unknown if the appointment was cancelled.

70.     The patient records above are illustrative of the fraudulent denial of care being perpetrated on this community. Extrapolated to the conservative estimate of 150,000 female Medicaid patients in the greater Baton Rouge metropolitan area annually affected by Defendant Healthcare Centers' actions, the amount of Federal and State funds provided over the last six years based on false claims is over $2.3 billion.

### B. Defendants Baton Rouge General Medical Center, Dr. Venkat Banda and HMG Physicians, LLC Violated the Stark Law.

71.     The Stark Law prohibits a hospital from billing Medicare and Medicaid for certain services referred by physicians with whom the hospital has an improper financial arrangement, including (i) the payment of compensation that exceeds fair market value of the services actually provided by the physician and (ii) the provision of free or below-market rent and office staff. 42 U.S.C. §§ 1395nn. Dr. Venkat Banda, HMG Physicians, LLC and BRG are in violation of the Stark Law through Dr. Banda's employment and board position with BRG and his employment and ownership of HMG Physicians, LLC, which refers and admits patients to BRG for designated health services.

72.     In 2005, Dr. Banda created a hospitalist group named Hospital Medicine Group, Inc. Hospitalists are physicians who admit and treat patients during a hospital stay. In 2007, Dr. Banda incorporated another hospitalist group named HMG Physicians, LLC ("HMG"). On information and belief, BRG acquired Hospital Medicine Group, Inc. around 2013/2014. This is corroborated by Louisiana Secretary of State records showing a single amendment filed for Hospital Medicine Group, Inc., which was a change in officer, on January 31, 2014. The current officers of Hospital Medicine Group, Inc. are listed as Executive Vice President Kendall Johnson and President Edgardo Tenreiro, CFO

34

and CEO of BRG, respectively. Further the current address of Hospital Medicine Group, Inc. is 8585 Picardy Avenue, which is BRG's Bluebonnet location.

73.    While Hospital Medicine Group, Inc. is purportedly owned, but undeniably controlled by BRG, HMG is owned and run by Dr. Banda. The fallacy of the distinction becomes clear simply upon a review of BRG's website. The BRG website section for Hospital Medicine states "BRG works with Hospital Medicine Group's physicians, physician assistants and nurse practitioners to focus on your care when you're here". The name "Hospital Medicine Group" hyperlinks to its own website which is the HMG Physicians website that states, "Welcome to Hospital Medicine Group". HMG identifies its 32 physicians, including Venkat Banda. HMG physicians not only work as hospitalists, but also have clinic hours where they see patients outside of an admitted setting in BRG office space. All but 5 of the HMG physicians are listed on the BRG website with BRG addresses of 8585 Picardy Place, 3600 Florida Boulevard or 3401 North Boulevard. If the HMG physicians are given office space, equipment and supplies as if they were BRG physicians, this is yet another violation of the Stark Law.

74.    BRG's 990s further attempt to differentiate between Hospital Medicine Group, Inc. and HMG Physicians, LLC, but fail to do so. BRG's 990s for FYE 2013-2017 reveal millions of dollars paid annually to HMG Physicians, LLC as an Independent Contractor – one of BRG's top five compensated Independent Contractors in each year. Alternatively, Hospital Medicine Group is separately identified as a Related Organization that is a Dormant Clinic in the BRG 990, Schedule R, Part IV – Identification of Related Organizations Taxable as a Corporation or Trust for FYE 2013-2017. Yet, upon review of the supplemental information, BRG FYE 2014-2017 990s state, "Board Member

35

(Banda) is the owner/principal of a healthcare service[s] provider…that provide[s] hospitalist, palliative care, geriatric, care management, non acute and graduate medical education services to the taxpayer. That service[s] provider [HMG Physicians LLC] is staffed by a related for-profit entity in accordance with a staffing services agreement."[12] So in effect, BRG acquired Hospital Medicine Group, Inc., which staffs HMG Physicians, a Banda owned entity, that BRG in turn pays millions annually for the use of BRG's own doctors.

| Entity | Independent Contractor | Related Organization | Amount BRG paid |
|---|---|---|---|
| HMG Physicians LLC | 2013 | | $1,890,000 |
| Hospital Medicine Group Inc. | | 2013 | Cash Value |
| HMG Physicians LLC | 2014 | | $3,032,914 |
| Hospital Medicine Group Inc. | | 2014 | Cash Value |
| HMG Physicians LLC | 2015 | | $3,319,510 |
| Hospital Medicine Group Inc. | | 2015 | Cash Value |
| HMG Physicians LLC | 2016 | | $2,594,897 |
| Hospital Medicine Group Inc. | | 2016 | Cash Value |
| HMG Physicians LLC | 2017 | | $3,368,884 |
| Hospital Medicine Group Inc. | | 2017 | Cash Value |

---

[12] For FYE 2013, supplemental information states that "Board Member (Banda) is compensated by a related, for-profit entity in accordance with an employment contract as a practicing physician and provider of hospitalist services. For FYE 2014, supplemental information states that "Board Member (Banda) is the owner/principal of a healthcare service provider (consisting of 42 physicians, physician assistants and nurse practitioners) that provide hospitalist, palliative care, geriatric, care management, non acute and graduate medical education services to the taxpayer. That service provider is staffed by a related for-profit entity in accordance with a staffing services agreement. For FYE 2015, supplemental information states that "Board Member (Banda) is the owner/principal of a healthcare services provider (consisting of 50 physicians, physician assistants and nurse practitioners) that provides hospitalist, palliative care, geriatric, care management, non acute and graduate medical education services to the taxpayer. That services provider is staffed by a related, for-profit entity in accordance with a staffing agreement. For FYE 2016, supplemental information states that "Board Member (Banda) is the owner/principal of a healthcare services provider (consisting of 56 physicians, physician assistants and nurse practitioners) that provides hospitalist, palliative care, geriatric, care management, non acute and graduate medical education services to the taxpayer. That services provider was staffed by a related, for-profit entity in accordance with a staffing services agreement until June 2016 at which time the agreement was terminated. For FYE 2017, supplemental information states that "Board Member (Banda) is the owner/principal of a healthcare services provider (consisting of 59 physicians, physician assistants and nurse practitioners) that provides hospitalist, palliative care, geriatric, care management, non acute and graduate medical education services to the taxpayer. That services provider was staffed by a related, for-profit entity in accordance with a staffing services agreement until June 2016 at which time the agreement was terminated.

75.    Dr. Banda, a Board Member of BRG, was consistently listed on BRG's 990, Part VII – Compensation of Officers, Directors, trustees, Key Employees, Highest Compensated Employees, and Independent Contractors for FYE 2013-2017. His reported earnings were as follows:

| Fiscal Year End | Average hours per week for BRG | Reportable compensation from BRG | Reportable compensation from related organizations | Estimated amount of other compensation from BRG and related organizations | Total |
|---|---|---|---|---|---|
| 2013 | 3 | $0 | $745,535 | $64,910 | $810,445 |
| 2014 | 3 | $0 | $423,114 | $66,023 | $489,137 |
| 2015 | 3 | $0 | $404,216 | $56,032 | $460,248 |
| 2016 | 3 | $0 | $301,341 | $57,333 | $358,674 |
| 2017 | 3 | $0 | $148,150 | $12,443 | $160,593 |

76.    Notably, the form requires "Average hours per week" and further provides space to "list any hours for related organizations below dotted line". For each FYE 2013-2017, Dr. Banda claims an average of 3 hours per week for BRG and 0 hours per week for any related organizations, yet significant income is reportedly paid to him from "related organizations" and zero dollars are reported compensation from BRG. Below is a further break down of Dr. Banda's reported benefits.

| Fiscal Year End | Base Compensation | Bonus & Incentive Compensation | Other Compensation | Deferred Compensation | Nontaxable Benefits | Total |
|---|---|---|---|---|---|---|
| 2013 | $225,000 | $296,702 | $226,833 | $44,000 | $20,910 | $813,445[13] |
| 2014 | $225,000 | $88,179 | $109,935 | $45,000 | $21,023 | $489,137 |
| 2015 | $225,000 | $0 | $179,216 | $35,000 | $21,032 | $460,248 |
| 2016 | $225,000 | $0 | $76,341 | $36,000 | $21,333 | $358,674 |
| 2017 | $93,746 | $44,850 | $9,554 | $4,477 | $7,966 | $160,593 |

---

[13] Dr. Banda's income has a $3,000 discrepancy between the two charts in the FYE 2013 990.

77.    In 2006, when Relator arrived in Baton Rouge and had privileges at BRG, there were still PCPs who had admitting privileges for BRG.[14] If Relator was in the hospital and needed a primary care consult, she was able to consult with whomever she wanted, including Dr. Banda's group. Over time, BRG began pressuring admitting PCPs to round every day, to complete their notes on site and generally imposed serious time constraints on the PCPs that interfered with their clinical practices. Dr. Banda approached the doctors and offered consultations. The result was that Banda's group became the sole physicians with admitting privileges and hospital privileges for adult primary care. They are the only available consult for specialists with adult patients admitted at BRG. For the past 5 years, BRG employs PCP and Family Practice doctors only to do clinical work – they no longer have admitting or hospital privileges. The last group to stop doing admissions was Dr. Donnie Batie's group out of Mid City. Dr. Batie's group gave up privileges 2 years ago after BRG presented them with an offer that they could maintain their income but they no longer needed to do admissions. They conceded though BRG's promise has proven to be false.

78.    Dr. Banda's group took over BRG admitting to the extent that Dr. Banda's partner, Dr. Raju Vatsavai,[15] who sat on the Credentialing Committee with Relator, fought granting credentials to a perfectly suited doctor in 2016. For two months, Dr. Vatsavai said the doctor should be interviewed, questioned why the doctor wanted privileges and only relented when the doctor requested very limited privileges.

---

[14] Specialists previously had and currently maintain admitting privileges at BRG. Dr. Banda's group generally covers internal and family medicine.

[15] Of note, Dr. Raju Vatsavai's wife is Padma Vatsavai, owner of Vinformatix L.L.C., a company that builds custom and web-based applications. Vinformatix lists Baton Rouge General as one of its clients.

79.    Relator also sat on the Medical Executive Committee for BRG. As a member of this committee she attended monthly meetings at which BRG's CEO and CFO were normally present and would give reports. Specifically, the CFO would provide hard copies of financial reports and give presentations. In early 2018, the CFO stopped attending meetings and there were no further financial presentations. Around May 2018, CEO Edgardo Tenreiro, stated that he had hoped that the previous months reports of decline had been a fluke, but it had been determined to be a trend of decline in market share. BRG was breaking even and had to reverse the trend.

80.    Approximately 6 months after CEO Tenreiro announced that BRG needed to stop its decline in market share, Banda's HMG Physicians, LLC and BRG made deals with The Baton Rouge Clinic. The Baton Rouge Clinic, a group of approximately 120 independent doctors, previously (and possibly currently) had admitting privileges at OLOL. In early 2019, HMG Physicians, LLC became the hospitalist group for The Baton Rouge Clinic. HMG is currently advertised on The Baton Rouge Clinic's website as the Clinic's Hospital Providers and every physician listed as a hospitalist on the Baton Rouge Clinic site is also listed on the HMG site. At the same time, The Baton Rouge Clinic's primary care doctors were granted active non-admitting privileges at BRG. Active non-admitting privileges basically grant doctors the privilege of eating in the cafeteria, as only HMG physicians are permitted to practice on admitted patients. But simultaneous to this new status, the BRG bylaws were changed to permit active non-admitting doctors voting rights at BRG. In effect, The Baton Rouge Clinic's doctors, which include Dr. Banda's HMG physicians, now have controlling vote of BRG, even though non-HMG physicians of The Baton Rouge Clinic may not see patients at BRG.

### C. Defendants Baton Rouge General Medical Center, Dr. Richard Rathbone and Rathbone Clinic Violated Suboxone Requirements of the Drug Addiction Treatment Act ("DATA").

81.     Buprenorphine, brand name Suboxone,[16] is a prescription medication specifically designed to ease withdrawal from highly addictive opiate drugs like heroin and the popular prescription pain medication OxyContin. Buprenorphine interacts with the same receptors in the brain that are affected by opiates, such as heroin and oxycodone, without causing the disorienting high that results from opiate abuse. The other active ingredient in suboxone is naloxone, which is added to the formulation to keep people from abusing the medication.

82.     The United States, through the Department of Health and Human Services ("HHS"), strictly regulates prescriptions of Suboxone. In 2000, Congress passed the Drug Addiction Treatment Act ("DATA"), a law permitting physicians to become eligible to prescribe approved opioid-based medications for the treatment of opioid addiction. Suboxone and Subutex were the first approved. Title 21, U.S.C. §823(g). Doctors could obtain a special waiver to treat addiction and to prescribe these medications, but each doctor was capped at treating a maximum of 100 addiction patients. In 2016, HHS Secretary Sylvia Burwell issued a final rule to increase from 100 to 275 the number of patients that qualified physicians who prescribe buprenorphine for opioid use disorders can treat. "The rule aims to increase access to medication-assisted treatment and associated behavioral health supports for tens of thousands of people with opioid use disorders, while preventing diversion."

83.     Dr. Richard Faures Rathbone has been the sole physician at Rathbone Clinic since 1982. He received his medical degree from Louisiana State University

---

[16] Additional brand names include Subutex, Zubsolv, Bunavail and Porbuphine.

School of Medicine and did his internship at Earl K. Long Medical Center. Rathbone Clinic is located at 11323 Church Street in Clinton, LA. Dr. Rathbone serves as medical director at Gulf Coast Occupational Medicine and has been associated with Lane Regional Medical Center. Around September 2019, the clinic was acquired by BRG and is currently affiliated with the Mid City Campus. BRG assigned a doctor to assist Dr. Rathbone in seeing patients, which would be a total of two physicians for Rathbone Clinic.[17]

84.    Dr. Rathbone's specialty is family medicine, but he also treats pain management for opioid addiction. Since 2014, Dr. Rathbone has been identified as providing suboxone treatment in the National Opiate Addiction and Treatment Resources Directory. Further he is listed as a suboxone prescribing doctor in the Suboxone Directory.

85.    Rathbone Clinic has a maximum of two doctors as of 3 months ago but has been operating solely with Dr. Rathbone from 1982 through 2019.[18] Rathbone Clinic sees 3300 active patients, approximately two-thirds of which are opioid/suboxone patients. That means Dr. Rathbone, and now BRG, operate a clinic subverting the Suboxone regulations by treating more than 2000 patients – over 7.5 times the permissible number of opioid addicted patients.

---

[17] Information on the BRG doctor assigned to Rathbone Clinic is available upon request. Further, on information and belief, Dr. Rathbone is currently out on medical leave.

[18] Rathbone's clinic lists Lisa H. Sorrell as a Nurse Practitioner working in the clinic and the Louisiana State Board of Medical Examiners identifies three physician assistants ("PAs") as supervised by Rathbone with P-SP Legend/Medical Device status, meaning they can prescribe controlled substances. There is no mention of any of the three PAs working at Rathbone's clinic, nor are the PAs or Sorrell listed on the Substance Abuse and Mental Health Services Administration ("SAMHSA") Buprenorphine Practitioner List. While it is possible to opt out of being publicly listed on the database, even if all four of these individuals were able to prescribe Suboxone, Rathbone is still over-prescribing the annual patient limit.

86.    Each submission for payment and certification of compliance filed by Dr. Rathbone as a physician, his clinic and by BRG since its acquisition of Rathbone Clinic, has been a false claim premised on fraudulent compliance with Federal and State laws.

**VIII.    DAMAGES.**

87.    The United States and the State of Louisiana have suffered and continue to suffer damages as a result of the acts and practices of Defendants, as described herein, in presenting, causing to be presented, and conspiring to present false and fraudulent claims, statements, and records to the United States and the State of Louisiana on behalf of Medicaid beneficiaries that were not eligible for payment as a result of Defendants' (i) denial of covered services; (ii) financial relationships violating the Stark Law; and (iii) violations of DATA's Suboxone regulations.

88.    Defendants' false statements were material to the decision of the United States and the State of Louisiana to cover and reimburse Defendants for the services challenged herein.

89.    Defendants profited unlawfully from the payment of the false and fraudulent claims by the United States and the State of Louisiana.

90.    Damages to the United States, the State of Louisiana, and the Federal Payer Programs are substantial.

## COUNT I
## VIOLATIONS OF THE FALSE CLAIMS ACT
### 31 U.S.C. § 3729(a)(1)(A)

91.     Relator restates and realleges the allegations contained in the preceding paragraphs as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

92.     The False Claims Act, 31 U.S.C. § 3729(a)(1)(A), provides in relevant part that any person who:

> knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval . . .
>
> is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 . . . plus three times the amount of damages which the Government sustains because of the act of that person. . . .

93.     By virtue of the acts described herein, Defendants knowingly presented, or caused to be presented, false or fraudulent claims to Federal Payer Programs to which they were not entitled.  Defendants knew that these claims for payment were false, fraudulent, or fictitious, or were deliberately ignorant of the truth or falsity of the claims, or acted in reckless disregard for whether the claims were true or false.

94.     Each claim presented or caused to be presented for the services challenged herein represents a false or fraudulent claim for payment under the FCA.

95.     Unaware that Defendants submitted false statements to conceal their misconduct and falsely certified compliance with laws and regulations despite pervasive and substantial non-compliance, the United States paid and continues to pay the false claims submitted by Defendants to Federal Payer Programs. Defendants' fraud and false statements were material to the decision of the United States to pay the false claims made

on behalf of Medicaid beneficiaries that were not eligible for payment as a result of Defendants' (i) denial of covered services; (ii) financial relationships violating the Stark Law; and (iii) violations of DATA's Suboxone regulations. These claims would not have been paid but for Defendants' fraud and false statements.

96.    In reliance on the accuracy of Defendants' statements, records, data, representations, and certifications, the United States has paid said claims and has suffered financial losses as a result of these acts by Defendants.

## COUNT II
## VIOLATIONS OF THE FALSE CLAIMS ACT
## 31 U.S.C. § 3729(a)(1)(B)

97.    Relator restates and realleges the allegations contained in the preceding paragraphs as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

98.    The False Claims Act, 31 U.S.C. § 3729(a)(1)(B), provides in relevant part that any person who:

> knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim . . .
>
> is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 . . . plus three times the amount of damages which the Government sustains because of the act of that person. . . .

99.    By virtue of the acts described herein, Defendants knowingly presented, or caused to be presented, false or fraudulent records or statements material to false or fraudulent claims for payment of the services to which they were not entitled. Defendants knew that the records and statements were false, fraudulent, or fictitious, or were

deliberately ignorant of the truth or falsity of the records and statements, or acted in reckless disregard for whether the records and statements were true or false.

100.    Each false or fraudulent record or statement material to a false or fraudulent claim for payment challenged herein represents a false or fraudulent claim for payment under the FCA.

101.    Unaware that Defendants submitted false records or statements to conceal the misconduct and falsely certified compliance with laws and regulations despite pervasive and substantial non-compliance, the United States paid and continues to pay the false claims submitted by Defendants' on behalf of Medicaid beneficiaries that were not eligible for payment as a result of Defendants' (i) denial of covered services; (ii) financial relationships violating the Stark Law; and (iii) violations of DATA's Suboxone regulations. Defendants' fraud and false statements were material to the decision of the United States to pay for the services challenged herein. These claims would not have been paid but for the Defendants' fraud and false statements.

102.    In reliance on the accuracy of Defendants' statements, records, data, representations, and certifications, the United States has paid for the services challenged herein and has suffered financial losses as a result of these acts by Defendants.

**COUNT III**
**VIOLATIONS OF THE FALSE CLAIMS ACT**
**U.S.C. § 3729(a)(1)(C)**

103.    Relator restates and realleges the allegations contained in the preceding paragraphs as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

104.    The False Claims Act, 31 U.S.C. § 3729(a)(1)(C), provides in relevant part that any person who:

> conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G) . . .
>
> is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 . . . plus three times the amount of damages which the Government sustains because of the act of that person. . . .

105.    By virtue of the acts described herein, Defendants conspired to commit violations of 31 U.S.C. §§ 3729(a)(1)(A) and (B) by knowingly presenting, or causing to be presented, false or fraudulent claims for payment by knowingly making, using, or causing to be made or used, false records or statements material to false or fraudulent claims. Defendants knew that these claims were false, fraudulent, or fictitious, or were deliberately ignorant of the truth or falsity of the claims, or acted in reckless disregard for whether the claims were true or false.

106.    Unaware of the conspiracy to submit false records and/or statements to conceal its misconduct and falsely certified compliance with laws and regulations despite pervasive and substantial non-compliance, the United States paid and continues pay the false claims on behalf of Medicaid beneficiaries that were not eligible for payment as a result of Defendants' (i) denial of covered services; (ii) financial relationships violating the Stark Law; and (iii) violations of DATA's Suboxone regulations. Defendants' fraud and false statements were material to the decision of the United States to pay for the services challenged herein. These claims would not have been paid but for Defendants' fraud and false statements.

46

107.    In reliance on the accuracy of Defendants' statements, records, data, representations, and certifications, the United States has paid said claims and has suffered financial losses as a result of these acts by Defendants.

**PRAYER AS TO COUNTS I-III**

WHEREFORE, Relator prays that this District Court enter judgment on behalf of Relator and against Defendants in Counts I-III, respectively, as follows:

a.    Damages in the amount of three times the actual damages suffered by the United States Government as a result of each Defendants' conduct;

b.    Civil penalties against the Defendants, respectively, equal to not less than $5,000 and not more than $10,000, adjusted for inflation according to the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461, for each violation of 31 U.S.C. § 3729;

c.    The fair and reasonable sum to which Relator is entitled under 31 U.S.C. § 3730(b); additionally, Relator is entitled, in equity, to recover attorneys' fees from the fund created for non-participating beneficiaries (those not contributing material time and expense to generating any settlement or recovery from any Defendants) under the Common Fund doctrine to be paid from the recovery fund generated for such non-participatory beneficiaries from Defendants;

d.    All costs and expenses of this litigation, including statutory attorneys' fees and costs of court;

e.    Pre-judgment and post-judgment, as appropriate, interest at the highest rate allowed by law;

f.    Relator's individual damages, if any, which may be alleged; and

g.    All other relief on behalf of Relator or the United States Government to which they may be justly entitled, under law or in equity, and the District Court deems just and proper.

## COUNT IV
## VIOLATIONS OF THE FALSE CLAIMS ACT – STARK LAW VIOLATIONS
## 31 U.S.C. § 3729(a)(1)(A)

108.    Relator restates and realleges the allegations contained in the preceding paragraphs as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

109.    The False Claims Act, 31 U.S.C. § 3729(a)(1)(A), provides in relevant part that any person who:

> knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval . . .

> is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 . . . plus three times the amount of damages which the Government sustains because of the act of that person. . . .

110.    By virtue of the acts described herein, Defendants BRG, Dr. Venkat Banda, HMG Physicians, LLC and Hospital Medicine Group, Inc. knowingly presented, or caused to be presented, false or fraudulent claims to Federal Payer Programs to which they were not entitled. Defendants BRG, Dr. Venkat Banda, HMG Physicians, LLC and Hospital Medicine Group, Inc. knew that these claims for payment were false, fraudulent, or fictitious, or were deliberately ignorant of the truth or falsity of the claims, or acted in reckless disregard for whether the claims were true or false.

111.    Each claim presented or caused to be presented for the services challenged herein represents a false or fraudulent claim for payment in violation of the Stark Law.

48

112.    Unaware that Defendants BRG, Dr. Venkat Banda, HMG Physicians, LLC and Hospital Medicine Group, Inc. submitted false statements to conceal their misconduct and falsely certified compliance with laws and regulations despite pervasive and substantial non-compliance, the United States paid and continues to pay the false claims submitted by Defendants BRG, Dr. Venkat Banda, HMG Physicians, LLC and Hospital Medicine Group, Inc. to Federal Payer Programs. Defendants BRG, Dr. Venkat Banda, HMG Physicians, LLC and Hospital Medicine Group, Inc.'s fraud and false statements were material to the decision of the United States to pay the false claims made on behalf of Medicaid beneficiaries that were not eligible for payment as a result of Defendants BRG, Dr. Venkat Banda, HMG Physicians, LLC and Hospital Medicine Group, Inc.'s financial relationships violating the Stark Law. These claims would not have been paid but for Defendants BRG, Dr. Venkat Banda, HMG Physicians, LLC and Hospital Medicine Group, Inc.'s fraud and false statements.

113.    In reliance on the accuracy of Defendants BRG, Dr. Venkat Banda, HMG Physicians, LLC and Hospital Medicine Group, Inc.'s statements, records, data, representations, and certifications, the United States has paid said claims and has suffered financial losses as a result of these acts by Defendants BRG, Dr. Venkat Banda, HMG Physicians, LLC and Hospital Medicine Group, Inc.

**COUNT V**
**VIOLATIONS OF THE FALSE CLAIMS ACT – STARK LAW VIOLATIONS**
**31  U.S.C. § 3729(a)(1)(B)**

114.    Relator restates and realleges the allegations contained in the preceding paragraphs as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

49

115. The False Claims Act, 31 U.S.C. § 3729(a)(1)(B), provides in relevant part that any person who:

> knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim . . .
>
> is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 . . . plus three times the amount of damages which the Government sustains because of the act of that person. . . .

116. By virtue of the acts described herein, Defendants BRG, Dr. Venkat Banda, HMG Physicians, LLC and Hospital Medicine Group, Inc. knowingly presented, or caused to be presented, false or fraudulent records or statements material to false or fraudulent claims for payment of the services to which they were not entitled. Defendants BRG, Dr. Venkat Banda, HMG Physicians, LLC and Hospital Medicine Group, Inc. knew that the records and statements were false, fraudulent, or fictitious, or were deliberately ignorant of the truth or falsity of the records and statements, or acted in reckless disregard for whether the records and statements were true or false.

117. Each false or fraudulent record or statement material to a false or fraudulent claim for payment challenged herein represents a false or fraudulent claim for payment in violation of the Stark Law.

118. Unaware that Defendants BRG, Dr. Venkat Banda, HMG Physicians, LLC and Hospital Medicine Group, Inc. submitted false records or statements to conceal the misconduct and falsely certified compliance with laws and regulations despite pervasive and substantial non-compliance, the United States paid and continues to pay the false claims submitted by Defendants BRG, Dr. Venkat Banda, HMG Physicians, LLC and Hospital Medicine Group, Inc.'s on behalf of Medicaid beneficiaries that were not

eligible for payment as a result of Defendants BRG, Dr. Venkat Banda, HMG Physicians, LLC and Hospital Medicine Group, Inc.'s financial relationships violating the Stark Law. Defendants BRG, Dr. Venkat Banda, HMG Physicians, LLC and Hospital Medicine Group, Inc.'s fraud and false statements were material to the decision of the United States to pay for the services challenged herein. These claims would not have been paid but for the Defendants BRG, Dr. Venkat Banda, HMG Physicians, LLC and Hospital Medicine Group, Inc.'s fraud and false statements.

119.    In reliance on the accuracy of Defendants BRG, Dr. Venkat Banda, HMG Physicians, LLC and Hospital Medicine Group, Inc.'s statements, records, data, representations, and certifications, the United States has paid for the services challenged herein and has suffered financial losses as a result of these acts by Defendants BRG, Dr. Venkat Banda, HMG Physicians, LLC and Hospital Medicine Group, Inc.

## COUNT VI
### VIOLATIONS OF THE FALSE CLAIMS ACT – STARK LAW VIOLATIONS
### 31 U.S.C. § 3729(a)(1)(C)

120.    Relator restates and realleges the allegations contained in the preceding paragraphs as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

121.    The False Claims Act, 31 U.S.C. § 3729(a)(1)(C), provides in relevant part that any person who:

> conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G) . . .

> is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 . . . plus three times the amount of damages which the Government sustains because of the act of that person. . . .

122.    By virtue of the acts described herein, Defendants BRG, Dr. Venkat Banda, HMG Physicians, LLC and Hospital Medicine Group, Inc. conspired to commit violations of 31 U.S.C. §§ 3729(a)(1)(A) and (B) by knowingly presenting, or causing to be presented, false or fraudulent claims for payment by knowingly making, using, or causing to be made or used, false records or statements material to false or fraudulent claims. Defendants BRG, Dr. Venkat Banda, HMG Physicians, LLC and Hospital Medicine Group, Inc. knew that these claims were false, fraudulent, or fictitious, or were deliberately ignorant of the truth or falsity of the claims, or acted in reckless disregard for whether the claims were true or false.

123.    Unaware of the conspiracy to submit false records and/or statements to conceal its misconduct and falsely certified compliance with laws and regulations despite pervasive and substantial non-compliance, the United States paid and continues pay the false claims on behalf of Medicaid beneficiaries that were not eligible for payment as a result of Defendants BRG, Dr. Venkat Banda, HMG Physicians, LLC and Hospital Medicine Group, Inc.'s financial relationships violating the Stark Law. Defendants BRG, Dr. Venkat Banda, HMG Physicians, LLC and Hospital Medicine Group, Inc.'s fraud and false statements were material to the decision of the United States to pay for the services challenged herein. These claims would not have been paid but for Defendants BRG, Dr. Venkat Banda, HMG Physicians, LLC and Hospital Medicine Group, Inc.'s fraud and false statements.

124.    In reliance on the accuracy of Defendants BRG, Dr. Venkat Banda, HMG Physicians, LLC and Hospital Medicine Group, Inc.'s statements, records, data,

representations, and certifications, the United States has paid said claims and has suffered financial losses as a result of these acts by Defendants.

### PRAYER AS TO COUNTS IV-VI

WHEREFORE, Relator prays that this District Court enter judgment on behalf of Relator and against Defendants BRG, Dr. Venkat Banda, HMG Physicians, LLC and Hospital Medicine Group, Inc. in Counts IV-VI, respectively, as follows:

a.    Damages in the amount of three times the actual damages suffered by the United States Government as a result of each Defendants BRG, Dr. Venkat Banda, HMG Physicians, LLC and Hospital Medicine Group, Inc.'s conduct;

b.    Civil penalties against Defendants BRG, Dr. Venkat Banda, HMG Physicians, LLC and Hospital Medicine Group, Inc., respectively, equal to not less than $5,000 and not more than $10,000, adjusted for inflation according to the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461, for each violation of 31 U.S.C. § 3729;

c.    The fair and reasonable sum to which Relator is entitled under 31 U.S.C. § 3730(b); additionally, Relator is entitled, in equity, to recover attorneys' fees from the fund created for non-participating beneficiaries (those not contributing material time and expense to generating any settlement or recovery from any of Defendants BRG, Dr. Venkat Banda, HMG Physicians, LLC and Hospital Medicine Group, Inc.) under the Common Fund doctrine to be paid from the recovery fund generated for

such non-participatory beneficiaries from Defendants BRG, Dr. Venkat Banda, HMG Physicians, LLC and Hospital Medicine Group, Inc.;

d.    All costs and expenses of this litigation, including statutory attorneys' fees and costs of court;

e.    Pre-judgment and post-judgment, as appropriate, interest at the highest rate allowed by law;

f.    Relator's individual damages, if any, which may be alleged; and

g.    All other relief on behalf of Relator or the United States Government to which they may be justly entitled, under law or in equity, and the District Court deems just and proper.

## COUNT VII
## UNJUST ENRICHMENT

1.    Relator restates and realleges the allegations contained in the preceding paragraphs as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

2.    Relator, on behalf of the United States, claims the recovery of all monies by which Defendants have been unjustly enriched, including profits earned by Defendants because of false claims made on behalf of Medicaid beneficiaries that were not eligible for payment as a result of Defendants' (i) denial of covered services; (ii) financial relationships violating the Stark Law; and (iii) violations of DATA's Suboxone regulations.

3.    By obtaining monies as a result of its violations of Federal and State law, Defendants were unjustly enriched, and are liable to account and pay such amounts, which are to be determined at trial, to the United States.

**PRAYER AS TO COUNT VII**

WHEREFORE, Relator prays that this District Court enter judgment on behalf of Relator and against Defendants in Count IV as follows:

a.      Damages sustained by the United States, including the amounts Defendants unlawfully obtained;

b.      All costs and expenses of this litigation, including statutory attorneys' fees and costs of court;

e.      Pre-judgment and post-judgment, as appropriate, interest at the highest rate allowed by law;

f.      Relator's individual damages, if any, which may be alleged; and

g.      All other relief on behalf of Relator or the United States Government to which they may be justly entitled, under law or in equity, and the District Court deems just and proper.

**COUNT VIII**
**VIOLATIONS OF THE LOUISIANA MEDICAL ASSISTANCE PROGRAMS**
**INTEGRITY LAW**
**LA REV. STAT, § 46:437.1 *et seq.***

4.      Relator restates and realleges the allegations contained in the preceding paragraphs as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

5.      This is a *qui tam* action brought by Alicia C. Taylor, MD and the State of Louisiana to recover treble damages and civil penalties under the Louisiana Medical Assistance Programs Integrity Law, LA. REV. STAT. § 46:437.1 *et seq.*

6.    LA. REV. STAT. § 46:437.3 provides *inter alia*:

(1)    No person shall knowingly present or cause to be presented a false or fraudulent claim;

(2)    No person shall knowingly engage in misrepresentation to obtain, or attempt to obtain, payment from medical assistance program funds;

(3)    No person shall conspire to defraud, or attempt to defraud, the medical assistance programs through misrepresentation or by obtaining, or attempting to obtain, payment for a false or fraudulent claim ...

7.    Defendants violated LA. REV. STAT. § 46:437.3 when they knowingly caused false claims to be made, used and presented to the State of Louisiana by its violations of Federal and State laws by submitting false or fraudulent claims for payment on behalf of Medicaid beneficiaries that were not eligible for payment as a result of Defendants' (i) denial of covered services; (ii) financial relationships violating the Stark Law; and (iii) violations of DATA's Suboxone. Defendants knew that these claims for payment were false, fraudulent, or fictitious, or was deliberately ignorant of the truth or falsity of the claims, or acted in reckless disregard for whether the claims were true or false.

8.    Each claim presented or caused to be presented for reimbursement for the services challenged herein represents a false or fraudulent claim for payment under the FCA.

9.    The State of Louisiana, by and through the Louisiana Medicaid program and other State healthcare programs, was unaware of Defendants' fraudulent and illegal practices and paid the claims submitted by Defendants in connection therewith.

10.    Compliance with applicable Medicaid, and various other Federal and State laws was a condition of payment of claims submitted to the State of Louisiana. Had the State of Louisiana known that Defendants violated the laws cited herein, it would not have paid the claims submitted by Defendants.

11.    As a result of Defendants' violations of LA. REV. STAT. § 46:437.3, the State of Louisiana has been damaged.

12.    Dr. Taylor is a private person with direct and independent knowledge of the allegations of the Original Complaint, who has brought this action pursuant to LA. REV. STAT. § 46:439.1(A) on behalf of herself and the State of Louisiana.

13.    This court is requested to accept pendant jurisdiction over this related State claim as it is predicated upon the same exact facts as the Federal claim, and merely asserts separate damages to the State of Louisiana in the operation of the Medicaid program.

**PRAYER AS TO COUNT VIII**

WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against Defendants, respectively:

To the STATE OF LOUISIANA:

(1)    Three times the amount of actual damages which the State of Louisiana has sustained as a result of Defendants' fraudulent and illegal practices;

(2)    A civil penalty of not less than $5,000 and not more than $10,000, for each false claim which Defendants caused to be presented to the State of Louisiana;

(3)    Prejudgment interest; and

(4)    All costs incurred in bringing this action.

57

To RELATOR:

    (1)    A fair and reasonable amount allowed pursuant to LA. REV. STAT. § 46:439.1(A) and/or any other applicable provision of law;

    (2)    Reimbursement for reasonable expenses which Dr. Taylor incurred in connection with this action;

    (3)    An award of statutory attorneys' fees and costs; and

    (4)    Such further relief as this Court deems equitable and just.

## DEMAND FOR JURY TRIAL

Relator demands trial by jury pursuant to Rule 38 of the Federal Rules of Civil Procedure and the Seventh Amendment to the U.S. Constitution.

Respectfully submitted,

Andrew M. Beato (DC Bar 469097)
ABeato@steinmitchell.com
Melissa Sussman Fox (NY Bar 4507729)
MFox@steinmitchell.com
STEIN MITCHELL BEATO & MISSNER LLP
901 15th Street, N.W.
Suite 700
Washington, D.C. 20005
(202) 737-7777 (telephone)
(202) 296-8312 (fax)

Robert B. Landry III, PLC     La. Bar No. 18998
5420 Corporate Boulevard, Suite 303
Baton Rouge, LA 70808

*Counsel for Relator*

March 11, 2020

## CERTIFICATE OF SERVICE

I certify that on this 11th day of March, a true and correct copy of the foregoing Complaint was filed under seal with the Clerk of Court. Service of this Complaint shall be made to the following parties listed below by U.S. Certified Mail, Return Receipt Requested:

| | |
|---|---|
| The Honorable William P. Barr<br>United States Attorney General<br>U.S. Department of Justice<br>950 Pennsylvania Avenue, NW<br>Washington, DC 20530-0001 | Brandon Fremin<br>United States Attorney<br>Russell B. Long Federal Courthouse<br>U.S. Attorney's Office<br>777 Florida Street, Suite 208<br>Baton Rouge, LA 70801 |
| Jeff Landry, Attorney General<br>1885 N. Third Street<br>Baton Rouge, LA 70802 | Jeff W. Traylor, Director, MFCU<br>Medicaid Fraud Control Unit of Louisiana<br>Office of the Attorney General<br>1885 N. 3rd Street<br>Baton Rouge, LA 70802 |

Andrew M. Beato
Melissa Sussman Fox
Robert B. Landry III      La. Bar No. 18998

59